99   371
f100 503

BRUNSWICK AND TOPSHAM WATER DISTRICT

*vs.*

MAINE WATER COMPANY.

Cumberland.    Opinion December 14, 1904.

*Water Company. Eminent Domain. Instructions to Appraisers. Franchise. Valuation. Damages. Evidence. Private and Special Laws, 1903, c. 158.*

In a proceeding for the condemnation and appraisal of a portion of a system of water works by the exercise of the right of eminent domain, under a statute which created a water district composed of two towns, with power to take a specified portion of an entire system, being operated in those two and other towns, and which provided that appraisers appointed by the court should fix the valuation of the plant, property and franchises taken, so that the owner should receive just compensation therefor; and further that the appraisers should assess damages for the severance of that portion of the plant, property and franchises taken from the owner's entire water system and franchises, the declared intent of the act being that the amount of the valuation of the property taken, and of the additional damages for severance, if any, taken together, should be so fixed as to equal the difference between the valuation, before severance, of the entire plant, property and franchises, and the value after severance of that portion of the plant, property and franchises not taken, both of the last named valuations to be determined under the principles of eminent domain; and it was further provided that the act itself should take effect when approved by a majority vote of the inhabitants of each of the towns which were to compose the water district, and that such an approval should constitute an acceptance by said water district of the methods of appraisal prescribed by the Act, and should bind the water district and the water company thereto, it is held that the appraisers should be instructed, among other things, in accordance with the following principles:

1.   In applying the rule that the basis of all calculations as to the reason-
ableness of rates to be charged by a public service corporation is the fair
value of the property used by it for the service of the public, franchise
values are not to be disregarded, that the element of going concern value
is not to be considered only as involved in structure value, and that prop-
erty value, in this connection, is not merely structure value.

2.   The fact that the structure taken is in use, and the further fact that it
may lawfully be used where it may properly enhance its value.

3.   The direction of the statute to the appraisers to fix the valuation of the
plant and of the franchises is in substance a direction to fix the valuation
of the plant as affected by the franchises.

4.   While actual cost bears upon reasonableness of rates, and as well, upon
the present value of the structure as such, in estimating structure value,
prior cost is not the only criterion of present value.   If by the rise of
prices, the present value of the structure is greater than the cost, the owner
is entitled to the benefit of it; if less than the cost, the owner must lose it.
And the same factors should be considered in estimating the reasonable-
ness of rates.

5.   Reasonable is a relative term, and what is reasonable depends upon
many varying circumstances.   But in determining what are reasonable
rates so as to produce a reasonable return to the owner upon his invest-
ment, the amount of money which has been actually and wisely expended
in producing the plant is a primary consideration.

6.   The question of the reasonableness of rates relates to both, the owner
and the customer.   But in case of conflict, they must be reasonable to the
customer in any event.

7.   A public service company cannot lawfully charge more than the services
are reasonably worth to the public as individuals, even if charges so lim-
ited would fail to produce a fair return to the owner upon his property or
investment.

8.   Profits which in the aggregate exceed a fair return on the owner's prop-
erty and franchises do involve unreasonable rates, and furnish no criterion
of either franchise values or going concern values.   But what would be a
fair return must depend upon the circumstances of each particular case.

9.   The issue of the reasonableness of rates charged, as well as all other
issues affecting value, are to be determined by a preponderance of the
evidence.

10.   The value is to be fixed as of January 1, 1904, and in determining the
value on that day, market prices of materials and labor on that day or
during a period long enough before that time for construction, are the
standards, rather than former prices.   And as to be completed on that
day, the construction of the plant must have been begun before, interest
upon the money invested in the plant during construction, and before
completion, is a part of the cost of construction.

11. Damages for severance are to be allowed as prescribed in the plaintiff's charter.

12. While it is not constitutionally competent for the legislature to prescribe a rule of damage, the rules prescribed in this case are to be deemed effective, not because they were established by the legislature, but because by the approval of the charter they were assented to by the inhabitants of the water district.

13. In estimating the value of a public service to the public or the customers, one of the elements necessary to be considered is the expense at which the public or customers, as a community, might serve themselves, were they free to do so, and were it not for the practically exclusive franchises of the supplying company. Water is to be regarded as a product, and the cost at which it can be produced or distributed, is an important, though not the only, element of its worth.

14. The worth of a water service in such connection, is the worth to the customers as individuals, but as individuals making up a community of water takers.

15. Communities are entitled to the benefit of existing natural advantages. If there is more than one source of supply, other things being equal, the community is entitled to have the least expensive one used, and the supplying company is not entitled to charge an enhanced rate based in part, at least, upon the cost of using a more expensive source.

16. When the rates which furnish a basis for estimating value are earned in part by property taken and in part by property not taken, the appraisers must discriminate, and so far as value may depend upon rates, they should charge the property taken for only its fair proportion of the earnings.

17. While the award of the appraisers must be made under the principles of eminent domain, it must be made upon such principles of eminent domain as were agreed to by the voting constituents of the water district, by approving the charter.

On report. Instructions to appraisers in accordance with opinion.

Proceedings under chapter 158, of the Private and Special Laws of 1903. After the appointment of appraisers, the petitioner filed a written request for instructions to the appraisers so appointed. The case was thereupon reported to the Law Court to determine what instructions, if any, should be given to the appraisers so appointed.

The case and requested instructions fully appear in the opinion.

*Weston Thompson and Barrett Potter,* for petitioner.

*C. F. Libby, F. W. Robinson and Levi Turner,* for Portland Trust Co..

*Orville D. Baker,* for Maine Water Company.

SITTING: WISWELL, C. J., WHITEHOUSE, STROUT, SAVAGE, PEABODY, SPEAR, JJ.

SAVAGE, J. The Brunswick and Topsham Water District was incorporated by act of the legislature, chapter 158, of the Private and Special Laws of 1903. By section 6 of that act, it was authorized to take, by condemnatory proceedings, the entire plant, property and franchises, rights and privileges of the Maine Water Company, within the district, with the exception of Thompson's brook and its tributaries. It was also provided in section 7 for the appointment of appraisers by the court, who should, after due notice and hearing, fix the valuation of the plant, property and franchises taken, so that the Maine Water Company should receive just compensation therefor. As was the case in *Kennebec Water District* v. *Waterville*, 97 Maine, 185, so here, it was provided that either party might ask the court for instructions to the appraisers, and that all questions of law arising upon such requests for instructions might be reported to the law court for determination, before the appraisers should act. The water district has commenced the condemnatory proceedings by petition filed in court, as provided by the act, appraisers have been appointed, and the petitioner has availed itself of the privilege of asking for instructions to the appraisers.

We cannot refrain from saying, as we intimated in the Waterville case, supra, that while there are some practical advantages in obtaining the judgment of the court in regard to the proper rules governing the fixing of compensation and the assessment of damages in cases of this character, in advance of the hearing by the appraisers, yet there are many difficulties, if not dangers, in attempting to formulate rules which are to be applied to facts not yet ascertained. While it may be easy enough to state rules in the abstract, it is much more satisfactory, in an opinion of the court, to express them in terms which are applicable to the facts in the precise case in hand. We cannot refuse to perform the duty laid upon us by the legislature, but it must always be understood that our answers to these questions are intended to be given only in the most general and comprehensive terms, which may, or may not, be found to be fitted to the facts

which may subsequently be developed. No other course would be wise or safe.

1. We are asked to say that "in applying the rule that the basis of all calculation as to the reasonableness of rates to be charged by a public service corporation is the fair value of the property used by it for the convenience of the public, franchise values are to be wholly disregarded, and the element of going concern value is to be considered only as involved in the structure value, that property value, in this connection, means structure value only." As no particular franchises are spoken of, we assume that reference is made to the ordinary franchises by which the company maintains and operates its existing plant, supplies water to customers and demands rates from them. In order to see the precise bearing of the requested instruction, it is necessary to remember that this is a proceeding to ascertain and fix the fair value of a water company's plant and property in active operation, and as well of the franchises by virtue of which it operates the plant, and that it is not a proceeding to reduce rates alleged to be excessive, nor is it a proceeding like most of those in which this question has been discussed, and which have been cited by counsel, where it is claimed by a public service company that rates have been made by statute or ordinance unreasonably or unconstitutionally low. All these may, or may not, arrive at the same conclusion. A public service property may or may not have a value independent of the amount of rates which for the time being may be reasonably charged. A public service company may, under some circumstances, be required to perform its service at rates prohibitive of a fair return to its stockholders, considering their property as an investment merely. *Smyth* v. *Ames,* 169 U. S. 466; *Covington, etc., Turnpike Co.* v. *Sandford,* 164 U. S. 578; *Chicago, Milwaukee & St. Paul Ry. Co.* v. *Minnesota,* 134 U. S. 418; *Cotting* v. *Kansas City Stock Yards Co.,* 183 U. S. 79. It is true that the fair value of the property used is the basis of calculation as to reasonableness of rates, but as was pointed out in the Waterville case, this is not the only element of calculation. There are others, as for instance, the risks of the incipient enterprise, on the one hand, and whether all the property used is reasonably necessary to the service, and whether as a structure it is unreasonably expensive, on the other. For a simple

illustration, suppose that a five hundred horse power engine was used for pumping when a one hundred horse power engine would do as well. As property to be fairly valued the larger engine might be more valuable than the smaller one, yet it could not be said that it would be reasonable to compel the public to pay rates based upon the value of the unnecessarily expensive engine. But it may not be that any of these distinctions are vital to the determination of the pending question. We allude to them merely to show that all of the principles applicable to the two classes of proceedings referred to are not necessarily identical.

Now, what is the property which the district has taken by the power of eminent domain? In the first place it is a structure, pure and simple, consisting of pipes, pumps, engines, reservoirs, machinery and so forth, with land rights and water rights. As a structure it has value, independent of any use, or right to use, where it is, — a value probably much less than it cost, unless it can be used where it is, that is, unless there is a right so to use it. Nevertheless it has value as a structure. But more than this, it is a structure in actual use, a use remunerative to some extent. It has customers. It is actually engaged in business. It is a going concern. The value of the structure is enhanced by the fact that it is being used in, and in fact is essential to, a going concern business. We speak sometimes of a going concern value as if it is, or could be separate and distinct from structure value, — so much for structure and so much for going concern. But this is not an accurate statement. The going concern part of it has no existence except as a characteristic of the structure. If no structure, no going concern. If a structure in use, it is a structure whose value is affected by the fact that it is in use. There is only one value. It is the value of the structure as being used. That is all there is of it.

But, again, it is not only a structure, and a structure being used, but it is a structure built, maintained and used by authority expressly granted to the company by the state, that is, it was built and is maintained and used by virtue of a franchise or franchises. The structure is lawfully in existence, and may rightfully continue to be used as a going concern structure, until the state determines other-

wise.  This also makes the structure in use more valuable.  It is the difference between a structure existing by sufferance, and one maintained by right.  The franchise, however, is a limited one.  It is not perpetual.  It may be recalled by the state.  It is not exclusive.  Other and competing franchises may be granted.  It is not absolute.  The right may be limited or qualified by express enactment.  One franchise is limited in the nature of things, and that is the franchise to charge tolls or rates for water furnished.  It cannot charge arbitrary rates beyond the power of revision.  It may not, as we have seen, under some circumstances charge rates even fairly remunerative upon the investment.  It can only charge reasonable rates in any event.  A franchise may exist entirely independent of the structure.  There may be franchises when there is no structure.  This water company may have franchises within this district which are not connected with the use of the structure which the district has taken.  Of that we have no knowledge.  But so far as the structure is maintained and used by virtue of a franchise, that fact may add to the value of the structure.  One would be likely to pay more for it as a structure if it could be rightfully used than he would if it could not.  What is it then that the district is taking and for which the company is entitled to just compensation?  It is a structure, in actual use, and with a right on the part of its owner to use it, and to charge reasonable rates to customers for services rendered.  This is all.  It is three fold in discussion, but it is single in substance.  The district obtains and the company yields its plant, its structure, but it is the structure as being used, with the rights to use it as stated, no less, no more.  We apprehend that some difficulty in discussion has arisen from attempting to differentiate in logic what is inseparable in fact.  The property taken is a single thing, to which belong certain characteristics which affect its value.  The thing cannot be taken without these characteristics.  If it is attempted to value the thing, separate from its inherent characteristics, elements which add value to the thing are omitted.  If these elements are omitted, the owner fails to receive the full and fair value of the thing, and thereby is denied just compensation.

The petitioner thinks that the property of the company should be

valued in entire disregard of its franchise characteristic. It says truly that the company has voluntarily devoted its money and property to a public service, that is, it is doing the work of the state or public. It says that in entering upon the business it put in its money and the state put in the franchises, and that the company ought to be satisfied with the fair present value of what it has itself put into the enterprise, and to receive nothing but the present worth of that actual investment, or as it would be more accurate to say, the present worth of the mere structure which was created by and represents the actual investment. But unfortunately for the petitioner's contention, the state actually gave these franchises, such as they were, to the company. They became the property of the company, but not beyond revocation, not, perhaps, beyond the power of the state to permit the property to be taken, without valuation of the franchises, as has been done in at least one other state. But until the state should say otherwise, the company would have the benefit of them. Now instead of saying otherwise, the state, by section 7 of the act under which these proceedings are had, has directed the appraisers to fix and award to the company the value of the franchises, which so far as the structure is concerned practically means, we think, the value of the property as affected by the franchises. And even in cases where by statute franchises were not to be included in the valuation, we conceive that it must have been implied that the property was to be valued as rightfully where it was, and rightfully to be used, for what are pipes in the ground worth as pipes, or reservoirs or dams or fixtures, unless they can be rightfully used, and reasonable tolls charged? And these rights are the franchises, at any rate, the most important ones.

Much of the petitioner's argument is based upon the contention that when it is said that reasonable rates are to be calculated upon the fair value of the property used, it means upon the actual money investment which has been reasonably expended. In this connection it should be noticed that to say that the reasonableness of rates depends upon the fair value of the property used, and that the fair value of the property used depends upon the rates which may be reasonably charged, seems to be arguing in a circle. If we should

say that reasonableness of rates depended solely upon the value of the property, and that value of the property depended solely upon the rates which may be reasonably charged, such would be the case. But neither proposition is true.   Other considerations than reasonableness of rates, as we have already observed in the Waterville case, and as we shall have occasion to observe later herein, affect the fair value of the property.   And the rates which it would be reasonable for the company to ask depend upon what would be a fair return, under the circumstances, upon the value of the property used, a question which we shall discuss later on.   In determining what would be a fair return, undoubtedly, the amount of money actually and wisely expended is a primary consideration.   Actual cost bears upon reasonableness of rates, as well as upon the present value of the structure as such.   It thus bears upon what is a fair return upon the investment, and so upon the value of the property.   In estimating structure value, prior cost is not the only criterion of present value, and present value is what is to be ascertained.   The present value may be affected by the rise or fall of prices of materials.   If in such way the present value of the structure is greater than the cost, the company is entitled to the benefit of it.   If less than the cost, the company must lose it.   And the same factors should be considered in estimating the reasonableness of returns.

Again upon the same point it should be said that those who engage in a public service cannot be put upon quite the same level as those who make mere investments.   They are not like the depositors in a savings bank, whose right to draw out is limited to precisely what they have put in, with its earnings.   They are, on the contrary, engaged in a business, with the ordinary incidents of a business, with some of the hazards and the hopes of a business.   To be successful they must be wise and prudent, thrifty and energetic.   These virtues, if they have them, they impress upon the property, making it more valuable than it would otherwise have been.   Is it to be said that they can have no return for skill and good management?   We do not think so.

They are entitled to charge reasonable rates.   Reasonable is a relative term, and what is reasonable depends upon many varying

circumstances. An equivalent to the prevailing rate of interest might be a reasonable return, and it might not. It might be too high or might be too low. It might be reasonable, owing to peculiar hazards or difficulties in one place to receive greater returns there, than it would in another upon the same investment. Then, their reasonableness relates to both the company and the customer. Rates must be reasonable to both, and if they cannot be to both, they must be to the customer. That the amount of the investment does not control either way is decided in *San Diego Land and Town Co.* v. *Jasper*, 189 U. S. 439, and *Stanislaus County* v. *San Joaquin, etc., Co.*, 192 U. S. 201. In the former case the court said that the rule that the company is entitled to demand a fair return upon the reasonable value of the property at the time it is being used for the public "is decided as against the contention that you are to take the actual cost of the plant, annual depreciation, etc., and to allow a fair profit on that footing over and above expenses." And in the latter, the court said,—"To take the amount actually invested into 'estimation' does not mean necessarily that such amount is to control the decision of the question of rates." So that while it is strictly true that the company is entitled to no more than a reasonable return upon its necessary investment, which is embodied in the structure and its natural increment, if any, that goes but a little way toward the solution of the problem, owing to the difficulty of saying just what is reasonable in a given case. That must for the most part be left to the good judgment of the tribunal which passes upon each particular case.

Now to go back to the original question, we say that changing the form of expression from structure to investment does not change the fact that the value of money invested, in whatever form it now is, is affected by the right to use it in that form, that is, by the franchise.

So that we conclude, because of the inherent impossibility of justly valuing the structure, separate from existing conditions and rights of user, and because of the statute which declares that the franchises shall be valued, that we cannot approve the requested instruction.

2. The second requested instruction is that "the rule that the public, that is, the customers, may demand that the rates shall be no

higher than the services are worth to them, not in the aggregate, but as individuals, is to be invoked only for the protection of the public, and that in a case requiring its application, it may result in reducing rates, even if reasonable within the rule stated in the foregoing request, never in raising rates otherwise fair to the company." We understand the purport of this request to be that a public service company cannot lawfully charge in any event more than the services are reasonably worth to the public as individuals, even if charges so limited would fail to produce a fair return to the company upon the value of its property or investment. Such, we think, is the law. We have already so stated in the discussion of the preceding request. In the Waterville case at page 202, we said: "The public, that is, the customers, may demand that the rates shall be no higher than the services are worth to them, not in the aggregate, but as individuals. The value of the services in themselves is to be considered, *and not exceeded.*" The company engages in a voluntary enterprise. It is not compelled, at the outset, to enter into the undertaking. It must enter, if at all, subject to the contingencies of the business, and subject to the rule that its rates must not exceed the value of the services rendered to its customers. It has accepted valuable franchises granted by the state, franchises ordinarily exclusive for the time being, franchises which ordinarily debar the public from serving themselves satisfactorily in any other way,—and in return it must perform the duties to the public which it has voluntarily assumed, at rates not exceeding the value of the services to the public, taken as individuals, and this irrespective of the remuneration it may itself receive.

3.  The third requested instruction is that "profits which in the aggregate exceed a fair return on the structure value, involve unreasonable rates and furnish no criterion of either franchise values or going concern values. The water district is entitled to the benefit of this and the foregoing rule, not only when rates or profits are obviously extortionate, but when the preponderance of testimony shows them to be unreasonable or excessive." This request involves two distinct propositions. As to the first it is sufficient to say that in its present form it is not approved. This follows from the discus-

sion already had under the first request. It may be said, however, that profits which in the aggregate exceed a fair return on the company's property and franchises as already defined in this opinion, do involve unreasonable rates and furnish no criterion of either franchise values or going concern values. The company is entitled, considering only its side of the question, to a fair return based upon the value of its property and franchises, as already stated, and no more. To charge more than necessary to secure such a return would be unreasonable.

We think the second proposition in this request should be given as stated. It is true that when the court is called upon to pass its judgment upon rates established by other tribunals, or when it is called upon to lay its strong arm upon a company and prevent what are alleged to be excessive charges, it will do so only when it is clearly made to appear that justice requires its intervention. It will not, for a slight cause, undertake to interfere with an established course of business, and disturb existing relations between a company and its customers. But this is a different proposition. Here the whole case is open. It is a valuation of property, and all elements proper for consideration in fixing that value are to be determined in accordance with the preponderance of the testimony.

4. The next request is:—"If, and so far as structure value depends upon cost, the market prices of pipe, labor, skill and supervision are to be taken as they were on the first day of January, 1904, and not as they were at prior times when the contract would have been necessary for the building of the structure to be completed for delivery on that day." This is not an accurate statement of the law. The ultimate fact to be ascertained is the value on January 1, 1904. The act provides that the valuation shall be fixed as of that date. Prior cost in this respect is only evidence, more or less valuable, as having a tendency to show value on that day. The value on that day may be more than the cost, or it may be less. To say nothing of depreciation, prices may have gone up or they may have gone down. If they have gone up, the company is entitled to the benefit of it, if they have gone down, the company loses it. This we have already stated in the former part of this opinion. The cost of pres-

ent reproduction is evidence of the strongest character of the present value of a structure, though other things are to be considered also. In determining, not cost, but present value, present prices of course are the standard, rather than former prices. It is suggested that in fixing the value on January 1, 1904, allowance must be made for the fact that a plant ready to be delivered on a given date must have been commenced a considerable time before. Certainly. When we say present prices we mean prices within a period necessary for construction. And a fair rate, usually the prevailing rate of interest, upon the money invested in the plant during construction, and before completion, is as much a part of the cost of construction, as is the money itself which is expended for materials and labor.

5.   The fifth request is based upon the following assumed facts, which the petitioner says it claims and will undertake to prove to the appraisers: —

Until the year 1891 and for many years prior thereto, the Pejepscot Water Company, a corporation, was owner of a water system at Brunswick and was in possession and operating the same; and the same was all the while a going concern.

Until the year 1891 and for many years prior thereto, the Bath Water Supply Company, a corporation, was owner of a water system at Bath and was in possession and operating the same; and the same was all the while a going concern.

Each of said systems had its own separate source of supply, pumping station, force mains, distribution pipes in the earth, stand pipes, hydrants, service pipes and complete and independent equipment.

The two distribution systems were nine miles apart and there was no legal or physical connection between them.

The source of supply and pumping station for the Bath system were at Thompson's brook in Brunswick, four miles or more distant, easterly, from any part of the distribution system and from any property of the Pejepscot Water Company.

In 1891, the Maine Water Company, by purchase, legally acquired the ownership and possession of all the property, rights and franchises of both said other corporations and afterwards, of its own volition, laid a new pipe, connecting the Brunswick system with the

pumping station at the brook and abandoned the source of supply previously used by the Pejepscot Water Company.

Afterwards, finding the supply at the brook inadequate for both systems, the Maine Water Company established a new pumping station at Nequasset Pond in the town of Woolwich, three miles distant, easterly, from the city of Bath, and connected the same by a force main with the Bath system and thenceforth made the pond its source of supply, retaining the station at the brook for use in case of accident interrupting the flow from the pond; so that since the establishment at the pond, the water supplied to the system at Brunswick, except when the same has been interrupted by accident or damage to the structure, has been brought from the pond, a distance of thirteen miles through the two rivers and through the city of Bath and the town of West Bath and portions of Woolwich and Brunswick. And said district respectfully prays that the appraisers be instructed.

Upon this statement of facts, the petitioner claims that the appraisers should be instructed that "they are not to regard the property taken under this proceeding as part of a greater system, but are to treat it as if no physical connection between the two old systems had been made; and that nothing should be allowed on the claim of the Maine Water Company for damages for severance." This instruction should not be given. As to whether the situation of the various parts of the company's property is such that ordinarily damages for severance should or should not be awarded is not even open to discussion here. The act providing for these proceedings, section 7, declares that the appraisers shall assess damages for the severance of the Brunswick plant, property and franchises from the company's entire water system and franchises. It also declares that it is the intent of the act that the amount of the valuation of the property taken, and of "the additional damages for severance, if any, taken together, shall be so fixed as to equal the difference between the valuation, before severance, of the entire plant, property and franchises of said company, in Brunswick, West Bath, Bath and Woolwich, and the valuation, after severance, of the plant, property and franchises of said company in the easterly part of Brunswick, and in West Bath, Bath and Woolwich, as aforesaid, both of the last

named valuations to be determined under the principles of eminent domain." It is objected that this provision in the legislative act creates a rule of damages different from what would otherwise obtain as the legal rule. It is claimed that it is for the court, and not for the legislature, to say what shall be the rules of damages, and of evidence to show or rebut damages, in cases of taking of property by the power of eminent domain, that the exercise of such a power is judicial in its character, and not legislative, and that the legislature is forbidden by the constitution, Art. III, sect. 2, from exercising judicial powers. To determine what is a lawful rule of damage is undoubtedly a judicial power, which the legislature is not constitutionally competent to exercise. But if the act in question does create a new rule and a different one from the judicial rule, the answer to the petitioner's objection is simple and complete. The act provides, section 13, that it shall take effect when approved by a majority vote by ballot of the inhabitants of each of the towns of Brunswick and Topsham, and that "the approval of this act in the manner provided by this section shall constitute an acceptance by said water district of the methods of appraisal prescribed by section seven hereof, and shall bind said water district and said water company thereto." The inhabitants of both of these towns constituted all of the inhabitants of the water district. And if the inhabitants of the two towns voted to approve the act, as they did, we see no reason to doubt the validity of their acceptance of the methods provided for an appraisal, and that it would bind them in their new corporate capacity. The act was tentative. It was a proposition. When the inhabitants approved it, the methods of appraisal, whatever they were, became effective, not because they were established by the legislature, but because they were agreed to by the inhabitants themselves. The water company consents to be bound by the act.

6. The petitioner claims that there is, not far from the old Pejepscot distribution system, above mentioned, "a source of supply of pure water from which an abundance may be easily taken for all present and prospective need of the system at Brunswick and of the system of the petitioner," and therefore it asks an instruction that, in such case, "the rule which forbids rates for water exceeding what

the service is worth to the consumers would not allow the Maine Water Company to charge rates to the customers on the Pejepscot system at Brunswick, or on the system of the petitioner, that would yield a net revenue exceeding a fair return on the capital which it would be necessary to employ to deliver to them water from the near source of supply above mentioned." We have already discussed in substance what is meant by "a fair return on the capital employed," and the relation which capital invested bears to present value of the property upon which the company may ask a return, and we will not repeat. The conclusions reached must be borne in mind whenever capital invested is sought to be made the basis of income.

We turn to the other question involved in this request. That relates to the assumed existence of a nearer and cheaper source of supply than the one now in use by the company, which is a part of its present entire plant, and which in part represents its actual investment. We do not doubt that when the worth of a public service of this kind to the public or the customers, is spoken of, necessarily one of the elements to be considered is the expense at which the public or customers, as a community, might serve themselves were they free to do so, and were it not for the existence of the practically exclusive franchises of the supplying company. When the worth of water to a consumer is to be estimated, we are not limited to the value of water in itself, for it is an absolute necessity. Its value has no limit. Water, speaking abstractly, is priceless, it is inestimable. To sustain life it must be had at any price. And in this respect a public water service differs from all other kinds of public service. In estimating what it is reasonable to charge for a water service, that is, not exceeding its worth to the consumers, water is to be regarded as a product, and the cost at which it can be produced or distributed is an important element of its worth. It is not the only element, however. The individuals of a community may with reason prefer to pay rates which yield a return to the money of other people, higher than the event shows they could serve themselves for, rather than make the venture themselves, and risk their own money to loss in an uncertain enterprise. It was said by us in the Waterville case that the investor is entitled to something for the risk he takes, and it is not unreasonable

for the consumer to be charged with something on that account. That is one of the things which make up the worth of the water to the customer. The same element enters always into the relations between producer and consumer. But such a consideration as this last one must always be treated with caution. The company is only entitled to fair returns, in any event, and "fair" to the customer as well as to itself.

In the aspect now being considered, the worth of a water service to its customers does not mean what it would cost some one individual, or some few individuals to supply themselves, for one may be blessed with a spring, and another may have a good well. It means the worth to the individuals in a community taken as a whole. It is the worth to the customers as individuals, but as individuals making up a community of water takers. In the very nature of things, a water system is usually intended to supply a somewhat compactly settled community, or a community whose geographical limits are somewhat restricted. As a matter of fact in this state such systems usually supply villages, or the more compact portions of cities. The necessity does not exist for extending such systems beyond these limits, and the expense would be practically prohibitive. Such a community must in general stand as a whole. The rates for such a system are generally and properly uniform, although the expense of supplying some, as those nearer the source of supply, is actually less than that of supplying those at the outermost limits. Still the benefits are uniform and uniform rates are reasonable. Now such a community is, we think, entitled to the benefit of such natural and sufficient facilities for procuring pure water as exist in its vicinity. Communities are in every respect entitled to the benefit of existing natural advantages.

It therefore seems to be reasonable that a public water service company undertaking to supply a community with water is bound to do so wisely and economically. It is bound to take advantage of practicable natural facilities. If there is more than one source of supply, other things being equal, the community is entitled to have the least expensive one used. So long as the company enjoys practically exclusive franchises, so long it must afford the community the

benefit of the conditions which nature has provided for them.    For instance, if water can profitably be served from a nearer source of supply, at a certain rate, the company ought not to be permitted to charge a higher rate based upon the expense of bringing it from a farther and more expensive source.    And this, even if in attempting to serve this and other communities together, it might be more profitable to the company to do so.

7.    It is asked that the appraisers be instructed that "the value of a structure, whatever it cost or might cost, cannot exceed the amount upon which it would yield a fair net revenue at rates which the water takers might lawfully be required to pay; and that in the present case allowance should be made for the fact that a source of supply and pumping station, equipment and connection not taken in this proceeding, must contribute to the procurement of revenue." The general proposition which is stated first, we have already considered sufficiently.    And, of course, it is true that when the rates which furnish a basis for estimating value are earned in part by property taken and in part by property not taken, the appraisers must discriminate, and so far as value may depend upon rates, they should charge the property taken for only its fair proportion of the earnings.

But in undertaking to separate the values of the different component parts of the company's entire system, so as to justly value only that which is taken, it must not be forgotten that the charter of the petitioner expressly gives the company the right to damages by severance, if any.    The charter rule which expresses the final result which the appraisers are to reach is a very simple one.    First find the value of the entire system, before severance, then the value of what is not taken, after severance, and the valuation of the property and franchises taken, and the damages for severance, if any, taken together, "shall be so fixed as to equal the difference."    Section 7 of the charter.    In finding the value of the entire system, the appraisers must consider the value of so much of the plant as lies within the district, for that is one of the parts which make up the whole.    And in valuing that part they will observe the rules as to values, and reasonable rates and natural advantages which have been already stated in this opinion, for all these must affect the value of

the whole system.   But when the value of the whole has been once ascertained the remaining procedure is simple.

8.   The last request is that "by the terms of the charter and independently of it, the award of the appraisers must be made 'under the principles of eminent domain'; that those principles are to be determined by the court and not by the legislature, and that the charter does not require the district to pay to the company more than 'full compensation' for what is taken and damages, 'if any,' under the principles of eminent domain." We have already answered this question, in effect, in considering the fifth question.   It seems to be aimed at the rule of "damages by severance." The request might be approved simply and without comment, for it is a correct statement of the rule to be followed in this case.   The estimation of just compensation for what is taken and of damages "if any" is to be had upon the principles of eminent domain.   The eminent domain rule gives damages for severances, in certain cases, just as it gives compensation, strictly so called, for property taken.   The difficulty here might have been to determine whether by the principles of eminent domain, the doctrine of damages by severance should be applied. That would have been purely a judicial question, had not the charter stated a rule arbitrarily, and the voting constituents of the petitioner agreed to it.   That agreement was that the damages by severance, if any, should be allowed, to be estimated, of course, upon the principles of eminent domain.   That agreement binds the petitioner and the court.

The appraisers will be instructed in accordance with this opinion.

*So ordered.*