GOLDFIELD CONSOL. WATER CO. v. PUBLIC SERVICE COMMISSION OF NEVADA et al.

(District Court, D. Nevada.   October 9, 1916.)

No. A-53.

1. EMINENT DOMAIN ☞84 — WATER COMPANY — REGULATION OF RATES — "PROPERTY."

The use of a water distributing plant is itself "property" and is protected against confiscation by the Constitution.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 227–230; Dec. Dig. ☞84.]

For other definitions, see Words and Phrases, First and Second Series, Property.]

2. WATERS AND WATER COURSES ☞203(10)—WATER COMPANIES—REGULATION OF RATES.

What a water company is entitled to demand in order that it may have a just compensation is a fair return upon the reasonable value of the property at the time it is being used for the public service, provided no more is exacted than its services are reasonably worth.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 294;  Dec. Dig. ☞203(10);  Constitutional Law, Cent. Dig. § 847.]

3. WATERS AND WATER COURSES ☞203(10)—WATER COMPANIES—VALUATION OF PROPERTY.

The original cost of the plant of a water company, the value fixed for taxation, the aggregate value of the company's issued bonds and capital stock, and the amount honestly and prudently invested, cannot any one of them alone be regarded as invariably or necessarily equivalent to present value for rate-fixing purposes;  the fact that the plant is in operation and circumstances and conditions which indicate the future

increase, diminution, or entire loss of its business, are also factors to be considered.

[Ed Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 294; Dec. Dig. ☞203(10); Constitutional Law, Cent. Dig. § 847.]

4. WATERS AND WATER COURSES ☞203(10)—WATER COMPANIES—REASONABLENESS OF RATES.

Unless in exceptional cases, depreciation in value of the property of a water company already accrued should not be charged upon future consumers.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 294; Dec. Dig. ☞203(10); Constitutional Law, Cent. Dig. § 847.]

5. WATERS AND WATER COURSES ☞203(10)—WATER COMPANIES—PUBLIC REGULATION OF RATES.

Evidence considered, and *held* insufficient to warrant a finding that rates fixed by a state commission to be charged by a water company were confiscating in advance of an actual test.

[Ed. Note.—For other cases, see Waters and Water Courses, Cent. Dig. § 294; Dec. Dig. ☞203(10); Constitutional Law, Cent. Dig. § 847.]

In Equity. Suit by the Goldfield Consolidated Water Company against the Public Service Commission of Nevada, J. F. Shaughnessy, H. F. Bartine, and W. H. Simmons, as members of and constituting the Public Service Commission of Nevada. On motion for preliminary injunction. Denied.

James F. Peck and Peck, Bunker & Cole, all of San Francisco, Cal., and Henry M. Hoyt, L. A. Gibbons, and L. N. French, all of Reno, Nev., for complainant.

George B. Thatcher, Atty. Gen., and H. F. Bartine, of Carson, Nev., for defendants.

FARRINGTON, District Judge. Since January 1, 1907, complainant has been engaged in developing, selling, and distributing water, and receiving and disposing of sewerage in the town of Goldfield and vicinity. The Public Service Commission of Nevada having made an order fixing the maximum rates which might be charged for such service, the company asks that the enforcement of the order be restrained permanently, as well as during the progress of the suit, and that the order itself be adjudged to be unjust, unreasonable, and confiscatory, and therefore void and of no effect.

The application for an injunction pendente lite is now before the court. It is alleged that the water and sewerage systems have actually cost $452,147.81, and that this amount should be increased 10 per cent. to cover interest and engineering expenses during the period of construction; that the cost of reproducing the plant with a daily capacity of 250,000 gallons would be $325,037.97, and the cost of reproducing the plant with its present capacity of 430,000 gallons per day would reach $400,000, which is its fair value; that the plant was constructed and installed when Goldfield had four or five times its present population; that mining is the only productive business of Goldfield, and, as the ore bodies will be entirely exhausted within a period of eight or nine years, complainant's property will have no value at the end of

that time; that during the past eight years, at the present rates, complainant "has earned  *  *  *  an average of 8.4 per cent. net on the cost of construction, and deducting bond interest $11\frac{1}{2}$ per cent. on the capital actually invested with no allowance for depreciation, which should be $12\frac{1}{2}$ per cent. per annum"; that the order complained of, if enforced, would cause a reduction of $7,500 in the company's net income, leaving a net profit of no more than 5.2 per cent. upon the fair value of its property, or 4.8 per cent. on the balance over bonded indebtedness, and that, too, without any allowance for depreciation. Assuming that the future profitable and productive life of Goldfield will not exceed eight years, the company asserts that it is entitled to water and sewerage rates sufficient to pay all its expenses, and yield for depreciation $12\frac{1}{2}$ per cent. on its present reproduction cost, interest at the rate of 6 per cent. on its bonded indebtedness, amounting to $249,000, and also a profit of 10 per cent. per annum on a sum which shall be equal to the difference between the bonded indebtedness and the reproduction cost.

In this controversy the court cannot act as a commission. It is not vested with the power to make rates, or to substitute its judgment as to what the rates should be, for the judgment of the rate-making body. Its jurisdiction is invoked on the ground that the new rates are confiscatory. If it be not made to appear that the rates will result in taking complainant's property for public use without just compensation, the court will refrain from interference.

[1] What the public in Goldfield is receiving from the water company is the use of the company's plant. This in itself is "property," and is protected by the Constitution. It is no more subject to public appropriation without just compensation than the plant itself. If the enforcement of the order complained of results in subtracting anything from that which under the circumstances is just, but no more than just, compensation for the use of the company's property, there is an invasion of its constitutional rights. To hold otherwise is to hold that the Constitution protects a portion but not all of one's private property. Spring Valley Water Co. v. San Francisco (C. C.) 165 Fed. 667.

[2] "What the company is entitled to demand [in order] that it may have a just compensation, is a fair return upon the reasonable value of the property at the time it is being used for the public" service, provided no more is exacted than its services are reasonably worth.

This rule is supported by a multitude of decisions, and by practically all the federal courts. Its significant feature, in view of the unusual circumstances of the present case, is that the value to be ascertained is present value, value at the time the property is being used, or, as Mr. Justice Peckham says in Wilcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034:

"The value of the property is to be determined as of the time when the inquiry is made regarding the rates."

It was this principle which led the Supreme Court to say in Knoxville v. Water Co., 212 U. S. 1, 29 Sup. Ct. 148, 53 L. Ed. 371:

"The cost of reproduction is one way of ascertaining the * * * value of a plant like that of a water company, but that test would lead to obviously incorrect results, if the cost of reproduction is not diminished by the depreciation which has come from age and use."

[3] In nearly every case of this kind, original cost, the value fixed for taxation, the aggregate value of the company's issued bonds and capital stock, and the amount honestly and prudently invested, have been urged as measures of value; but it is impossible to regard any one of them as invariably or necessarily equivalent to present value. A prudent, well-informed man, who is figuring on what he can afford to pay for a plant such as the one under consideration, would naturally inquire as to every such matter; he would also investigate, among other things, all circumstances and conditions which tend to increase or diminish the demand for, and the value of its services, and the probable duration and constancy of such demand. Unquestionably, the fact that complainant's plant is actually doing business, and is a going concern, is an important element of value. National Waterworks Co. v. Kansas City, 62 Fed. 853, 864, 10 C. C. A. 653, 27 L. R. A. 827; Spring Valley Water Co. v. San Francisco (C. C.) 192 Fed. 137, 166; Whitten on Valuation of Pub. Service Corp. § 520 et seq.; Pond on Pub. Utilities, §§ 473, 474.

In many cases the courts have declined to give this element an independent and distinct expression, but have preferred rather to consider it as a characteristic of the plant, the value of which is affected by the circumstance that it is or is not a going concern. Brunswick Water Dist. v. Maine Water Co., 99 Me. 371, 59 Atl. 537, 538.

It has been said that the cost of reproduction new, less depreciation, when properly considered, is the same as fair present value. This may be true in normal cases of property located in settled communities where values are stable, but here the problem is complicated by the fact that at the present time the town of Goldfield has not more than one-third the population it had when complainant's plant was acquired and constructed. Since then the value of substantially all other fixed property in that locality has fallen at least 50 per cent. No reason has been advanced why complainant's fixed property values have not shrunk in the same ratio.

It is difficult to conceive how there can be a reliable estimate of fair present value which is not controlled to some extent by the fact that the plant is in operation, and by circumstances and conditions which indicate the future increase, diminution, or entire loss of its business.

Complainant's plant is capable of supplying 13,000,000 gallons of water per month; but, at the time these proceedings were initiated before the defendant commission, the average monthly sales were no more than 5,000,000 gallons.

The life of Goldfield, as of every mining camp, is uncertain; sooner or later the ore deposits will be exhausted, and the mines abandoned. Complainant avers that when this occurs, at the expiration of eight or nine years, its property will have no value. The bulk of this depreciation will have been caused, not by age, use, or action of the

elements, but by the failure of the mines; there will be no market in Goldfield for complainant's water, or any considerable demand for its services. If depreciation of this character must be provided for in the rates, as complainant demands, it is no more than just that it should be considered in determining the present reasonable value of the property.

Complainant alleges a present value of $400,000, and a total actual cost of $496,345.74. Charles G. Patrick, general manager of the water company, testifies to an actual money expenditure, as shown by accounts regularly kept, of $452,147.81, which he says should be increased 10 per cent. to cover incidental construction costs, and interest on capital expended during the period of construction. He states, however, that he is content to call the reproduction cost $400,000 for the purposes of this inquiry. For the purposes of taxation, the same witness swears that the value of the property since 1912 was not more than $75,000. This he explains by saying:

"I make my basis of $75,000 as the assessed valuation as being 60 per cent. of the valuation of the property, * * * for the simple reason that is all the property will bring. It is only earning approximately 10 per cent. on that valuation at this time. I maintain, on the other hand, that the investors in this property are entitled to earn and consequently are entitled to a rate-making valuation in proportion to the investment they have actually made; that they are not responsible for the depreciation in those values which make the property only worth for assessment purposes upon what it will earn, which is about $125,000."

A. G. H. Curry, an engineer, for certain patrons of the water company testified that the plant could be reproduced new for $308,960, and that its reproduction value in its present condition is $212,450.

W. K. Freudenberger, engineer for the Public Service Commission, testifies that the actual reproduction value new of the plant as a whole is $339,282, and that at the present time, in its depreciated condition, the actual reproduction value is approximately $233,600, and the actual commercial value no more than $151,000.

The present water company has been in existence since 1907. The face value of its issued stock is $988,966. Its issued and outstanding bonded indebtedness amounts to $232,000. Mr. Patrick testifies that the bonds sell for a little over 50 cents on the dollar, and that there is absolutely no market for the stock. In the pleadings defendants admit a valuation of $233,600.

There is no evidence before the court at the present time which will justify a higher present commercial valuation than that testified to by Mr. Freudenberger.

As to complainant's demand for a 10 per cent. profit on a sum which shall be equal to the difference between its bonded indebtedness and the reproduction cost of the plant, it is unnecessary at the present time to announce any definite conclusion. There is some force in the suggestion that the bank rate of interest in Goldfield is not a reliable criterion, because it represents gross rather than net return for the use of money. On the other hand, it must be remembered that in a mining camp a prudent loan is much less hazardous than an invest-

ment in fixed property, or property which cannot be moved except at a cost which consumes its value.

For several reasons the rate demanded for depreciation seems to me to be too high.

First, complainant has a plant which, according to the bill, is capable of supplying 13,000,000 gallons of water per month to the people of Goldfield. The expense of delivery, including taxes, in June, 1915, was 62 cents per thousand gallons. At the present time the company is selling no more than 5,000,000 gallons of water per month, of which about 4,500,000 gallons are delivered to some nine large concerns for an average price of about 59 cents per thousand gallons, while about 500,000 gallons are furnished to some 500 domestic customers, hotels, and saloons at an average price of more than $5 per thousand gallons. Thus it appears that the company's profit, as well as the allowance for depreciation, will be drawn, if present rates continue, from patrons who are using no more than 4 per cent. of the water which complainant is able to supply.

[4] Second. For eight years, while its mines have been yielding $65,000,000, Goldfield has been wonderfully prosperous. During that time the company apparently has had a free hand in the matter of fixing rates, but it has collected nothing for depreciation. The commercial value of its property has diminished more than 50 per cent. It seems unfair that this burden of accrued depreciation should be added to current depreciation and cast upon the present retail consumers of the company. Save in exceptional cases—and this is not an exceptional case—depreciation properly chargeable to one period should not be collected from the customers of another period. Puget Sound Electric Ry. v. Railroad Com., 65 Wash. 75, 117 Pac. 739, 748, Ann. Cas. 1913B, 763; Harris v. South Side Gas & Electric Co., P. U. R. 1915F, 747, 759; Whitten on Valuation of Pub. Service Corp. § 483 et seq.

Third. The claim is made that complainant's plant at the expiration of the next eight years will have become valueless, for, in consequence of the exhaustion of the mines at that time, there will be no market for water. For all that appears in the bill or in evidence, the plant may be as efficient then as now, and its water supply may be needed for other purposes. Furthermore, the total depreciation cannot exceed the difference between the present value of the plant and its salvage value at the expiration of eight years.

Fourth. Speculation as to the probable life of Goldfield will not lead to any conclusion substantial enough to be controlling. Unquestionably the present life of the mines is uncertain. This is a hazard which every investor, not only in Goldfield but in any other mining camp, knows and appreciates. This risk is reflected in rates of interest, and in prices generally. In my judgment, it should be taken care of in the rates; but it is impossible by judicial decree to fix the date when the productive life of any group of mines will come to an end.

While the company is entitled to a fair return on the reasonable value of its property, the public has a right to demand that no more

shall be exacted than the services are reasonably worth under the circumstances.

"The public cannot properly be subjected to unreasonable rates in order simply that stockholders may earn dividends." Compensation for the services of a public utility "must be just to the public, and should be just to the company; but, if it cannot be just to both, it must in any event be just to the public." This is clear, because one who has voluntarily devoted his property to the service of the public cannot complain that he is the victim of confiscation if he receives all that the service is worth. Covington & L. T. R. Co. v. Sandford, 164 U. S. 578, 597, 598, 17 Sup. Ct. 198, 41 L. Ed. 560; Water Dist. v. Water Co., 99 Me. 371, 59 Atl. 537; Southern Pac. Co. v. Bartine (C. C.) 170 Fed. 725, 767; Puget Sound Electric Ry. v. Railroad Com., 65 Wash. 75, 117 Pac. 739, 744; Whitten on Valuation of Pub. Service Corp. § 1012; Pond on Pub. Utilities, §§ 453, 454.

[5] Does the evidence overcome the presumption that the rates fixed in the order of the commission constitute a reasonable return for the services of the company?

It must be borne in mind that the reduction complained of will affect only retail customers. This is very clearly shown by tables D and F set out in Commissioner Shaughnessy's opinion. From table D it appears that in June, 1915, 4,533,852 gallons were sold to nine wholesale customers for 58.6 cents per thousand gallons; 172,984 gallons were delivered to 401 domestic users for $6.20 per thousand gallons; 171,385 gallons were delivered to 101 commercial patrons for $5.53 per thousand gallons; and 96,875 gallons were supplied for 85 lawns at a price of $2 per thousand gallons. Elsewhere in the record it is shown that the principal mining and milling company in the district and the Tonopah & Goldfield Railroad Company pay a net rate of 50 cents per thousand gallons. The total receipts from sales of water were $4,869.27 for the month. During the same month, 137 users of the sewer paid an average monthly charge of $5.24, or a total of $717.85.

The order complained of fixes the maximum charge per thousand gallons for retail customers at $3, and for wholesale customers at $1; the charge for each sewer connection for residences cannot exceed $2 per month, or for commercial service $5 per month.

Mr. Freudenberger, in his affidavit, states that 620 consumers are buying water from wagons in Goldfield, for which they are paying from $3 to $7 per thousand gallons. The company's average operating expenses, including taxes, per thousand gallons, in 1915 were 62 cents. Thus the company was selling to at least two customers water at 12 cents per thousand gallons less than cost.

The following statement of fact taken from the opinion of the commission fairly illustrates prevailing conditions in Goldfield:

"The record shows that a rooming and boarding house, which on the average takes care of from 15 to 16 patrons, has a monthly water bill, at the present time, of approximately $26; compared with which, it shows that during 1906 a rooming and boarding house, with 65 to 80 patrons and 4 employés, had secured water from water wagons at a monthly charge ranging

between $24 and $26. Again, it was shown that a residence consumer having one bath, toilet, wash bowl, and kitchen sink, with five in his family, paid during a five-month period, for an average of 3,000 gallons per month, an average charge of $14.70 per month, and also a charge of $3.75 per month for sewer service, making the average monthly bill for water and sewer service $18.45 covering said period. The consumption in this case, considered in connection with the maintenance of a modern house or cottage and a family of five members, appears to be reasonable and necessary from the standpoint of a reasonably adequate supply for domestic and sanitary purposes.

"From the statement furnished for the month of June, 1915, we find that respondent's residence consumers use an average of only 432 gallons of water at an average charge of $2.68 per month, within which the consumption ranges from approximately 150 gallons to 3,000 gallons of water, and the monthly charges from $1.60 to $15. Again, we find that the business or commercial consumption ranges from 500 gallons to 16,000 gallons, and the monthly charges from $3 to $65."

The sewerage service appears to have been operated under similar conditions, and exhibits the same contrast between capacity and actual service. The monthly charges for domestic sewer service are from $2.25 to $3.75 for each connection per month, and for commercial service from $3 to $10. Of the company's 511 water consumers, only 137 make any use of the sewer.

In explanation of the low wholesale rate at which water is given to the mining and railroad companies, Mr. Patrick testifies that they are obliged to fix a low rate, otherwise the companies will supply their own water.

If the mining company and the railroad company can produce their own water at a cost which precludes a charge against them of more than 50 cents per thousand gallons, if 620 of the 1,130 consumers in Goldfield are supplied from water carts at prices ranging from $3 to $7 per thousand gallons, and if in a town of 4,000 or 5,000 inhabitants there are but 137 sewer connections, the only reasonable inference is that the prevailing rates exceed the reasonable worth of the services rendered and unduly discourage consumption of water. Commissioner Shaughnessy intimates that the effect of the rates has been to restrict the use of water in Goldfield to an average of about two gallons per capita per day for domestic purposes, a quantity which in the judgment of those best informed in such matters is insufficient for proper sanitation. When this is considered in connection with the fact that the plant is capable of supplying more than twice as much water as the people of Goldfield are using, it is difficult to put aside the suggestion that lower rates should at least be fairly tested, and that a minimum charge should entitle the consumer to an amount of water which is reasonably sufficient for domestic and sanitary purposes. These observations will apply to the sewerage charges as well.

I am of the opinion that the evidence is insufficient to overcome the presumption in favor of the reasonableness of the rates fixed in the order complained of.

An injunction pendente lite will therefore be denied.

Each party will have 20 days within which to take such steps as it may be advised.