LOUISVILLE & N. R. CO. v. RAILROAD COMMISSION OF ALABAMA
et al. SOUTH & N. A. R. CO. v. SAME. NASHVILLE,
C. & ST. L. RY. v. SAME.

(District Court, N. D. Alabama, M. D. April 5, 1912.)

No. 264 C. C. No. 263 C. C. No. 266 C. C.

**1. CONSTITUTIONAL LAW (§ 242*)—CARRIERS (§ 12*)—GOVERNMENTAL REGULA-
TION OF RATES—PRINCIPALS GOVERNING.**

The power of the government to regulate railroads to preserve the just
relation between the public and the corporations serving it is undoubted.
The right of the public is to have reasonable and uniform rates, and the
right of the railroads is to have an equal protection of the laws with citi-
zens generally and fair returns on their investments.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 691;
Dec. Dig. § 242;* Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

**2. CONSTITUTIONAL LAW (§ 242*)—STATE REGULATION OF RATES—CLASSIFI-
CATION.**

The principles governing the right to classify railroads for the purpose
of prescribing rates are somewhat similar to those applicable to their
classification for purposes of taxation, but, in the exercise of this right
in either case, the classification must have regard to, and be based on,
some real and substantial distinction bearing a reasonable and just rela-
tion to the things in respect to which such classification is imposed, and
the grounds of classification must be such as are discoverable and under-
stood to be reasonable on full investigation by competent persons.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 691;
Dec. Dig. § 242.*]

**3. CONSTITUTIONAL LAW (§ 242*)—STATE REGULATION OF RATES—CLASSIFICA-
TION—CONSTITUTIONALITY OF ALABAMA STATUTE.**

Act Ala. Nov. 23, 1907 (Acts Sp. Sess. 1907, pp. 91–159), prescribes cer-
tain maximum rates to be charged by railroads in the state on intra-
state business. It divides the roads doing business in the state by name
into four classes, and authorizes those in class 1 to charge the maximum
rate plus 5 per cent., class 2 plus 20 per cent., class 3 plus 25 per cent.,
and class 4 plus 50 per cent. It authorizes the State Railroad Commis-
sion to change the classification, and provides that, when any railroad
in class 1 shall own or operate any other road or own a majority of its
stock, the latter shall itself be placed in class 1. In a suit by certain
railroads to enjoin enforcement of such act, the evidence showed without
contradiction that the classification made was not based upon any sub-
stantial difference between the several roads, such as the relative cost
of construction and maintenance or earnings from intrastate business,
but that roads between which there was no difference discoverable by
experts were placed in different classes, giving to some a large advan-
tage in rates over others; that the lines of one of complainants in the
state, which were largely branch lines, and which were well conducted
and managed but earned little or nothing above expenses on intrastate
business and ranked fourth in net earnings per mile from all business,
were placed in class 1, while others making larger earnings were placed
in lower classes; that certain companies which were originally parties
to the suit but withdrew by agreement with the Governor were placed
by the commission in more favorable classes. There was no evidence
tending to show upon what basis, if any, the classification was made.
*Held*, that complainants were required to establish the unreasonableness
of the classification by a preponderance of the evidence only, and that
on the evidence, and in view of the manner of its enforcement by the
administrative officers of the state, the act made an arbitrary and un-

For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

reasonable classification, and was unconstitutional and void, as depriving complainants of the equal protection of the laws.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 691; Dec. Dig. § 242.*]

**4. CARRIERS (§ 12*)—STATE REGULATION OF RATES—REASONABLENESS OF RATES—VALUATION OF PROPERTY.**

In ascertaining the value of a railroad for the purpose of determining the validity of a rate regulating statute, the most reliable test ordinarily is the cost of reproduction of the road as it exists at the time when the statute was enacted, taking the value of property at that time, without regard to what may have been its value when the road was constructed. The original cost and market value of the stock and bonds of the company, while they may be taken into consideration, are subject to so many collateral considerations that they are ordinarily of little assistance.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

**5. CARRIERS (§ 12*)—STATE REGULATION OF RATES—VALUATION OF PROPERTY—FRANCHISES.**

In valuing the property of a railroad company for the purpose of determining the validity of a state statute regulating rates, the value of the company's franchise is to be included, and where the state, by its Tax Commission, has placed a value on such franchise for taxation purposes, it may fairly be taken by the court as a basis for its finding.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

**6. CARRIERS (§ 12*)—STATE REGULATION OF RATES—VALIDITY—REASONABLENESS OF RATES.**

For the purpose of determining whether or not a state statute fixing railroad rates is reasonable or confiscatory as to a particular company, it is necessary to ascertain the value of all of its property devoted to its business as carrier in the state, and to apportion such value between its interstate and intrastate business, and it is entitled to earn a fair return from its intrastate business on the value of the property devoted to such business, regardless of its interstate earnings.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

**7. CARRIERS (§ 12*)—STATE REGULATION OF RATES—REASONABLENESS OF RATES.**

Methods of apportioning the value of the property of railroad companies between their interstate and intrastate business considered.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

**8. CARRIERS (§ 2*)—STATE STATUTE FIXING RATES—CONSTITUTIONALITY—REASONABLENESS OF RATES.**

Act Ala. Nov. 23, 1907 (Acts Sp. Sess. 1907, pp. 91–159), fixing maximum rates to be charged by railroads in the state on intrastate shipments, *held* confiscatory and unconstitutional and void as to complainant railroad companies, on evidence showing that, prior to its enactment, their intrastate business was either done at an actual loss or their net profit was only a fraction of 1 per cent. on the value of the property devoted to such business, and that the then prevailing rates, which were not unreasonably high, were reduced by the act.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 2; Dec. Dig. § 2.*]

**9. CARRIERS (§ 12*)—STATE STATUTE FIXING RATES—REASONABLENESS OF RATES—RETURN ON INVESTMENT.**

Railroads in Alabama are entitled to earn a net profit of 8 per cent. on the value of the property employed by them in intrastate business, so

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
196 F.—51

long as the business is done without discrimination and at reasonable rates.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

10. CARRIERS (§ 12*)—STATE STATUTES REGULATING RATES—CONFISCATORY RATES.

A railroad has the right to change rates which to meet an exigency have been made so low as to be unremunerative, when the necessity therefor has ceased to exist, and a statute which prohibits the increase of such rates is unconstitutional as confiscatory.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

In Equity. Suits by the Louisville & Nashville Railroad Company, the South & North Alabama Railroad Company, and the Nashville, Chattanooga & St. Louis Railway Company, respectively, against the Railroad Commission of Alabama and others. On final hearing on exceptions to report to special master. Decree for complainants.

See, also, 171 Fed. 225.

On the 25th of March, 1907, the Louisville & Nashville Railroad Company, the Nashville, Chattanooga & St. Louis Railroad Company, the Atlantic Coast Line Railroad Company, the Kansas City, Birmingham & Memphis Railroad Company, the Southern Railway Company, and the Central of Georgia Railway Company, all foreign corporations, and the Western Railway of Alabama, the Alabama Great Southern Railroad Company, the Mobile & Ohio Railroad Company, the Seaboard Air Line Railroad Company, and the South & North Alabama Railroad Company, all domestic corporations, operating railroads in this state, filed their original bills in the Circuit Court against the Railroad Commission and the Attorney General of Alabama; the object of the bills being to enjoin the execution of the statute which forfeited the right of any foreign corporation to do intrastate business if it filed a bill in the federal court to test the reasonableness of rates, and of the statute prescribing freight rates on 110 commodities, and also the enforcement of the statute which made the other rates in force on the 1st day of January, 1907, the maximum intrastate freight rates, and the statute which fixed the maximum intrastate passenger rate at 2½ cents per mile. The statutes at that time charged the Railroad Commission and the Attorney General with the duty of enforcing these statutes and other laws pertaining to railroad carriers, and provided that any railroad might test the reasonableness of any rate made by the Commission by making the Railroad Commission and the Attorney General defendants in a suit in equity, in which event the court, if it thought proper, might upon exacting bond for the indemnity of passengers and shippers suspend the operation of the statutes pending a final hearing. The statutes involved were assailed on the ground that they denied the complainants the equal protection of the laws; that they deprived them of their property without due process of law in violation of the fourteenth amendment; that they impaired the obligation of their contracts, and amounted to a direct regulation and control of interstate commerce.

On the filing of the bills, notice was given the defendants that a motion would be made for a restraining order and suspension of the rate laws on March 30, 1907. Each of the bills contained elaborate statements as to the value of the several complainants' property, the cost of conducting the business of the several railroads, the amounts expended in building them, the net and gross income for the prior years, the characteristics of the country through which the roads were operated, and numerous other facts showing the value of the property employed, etc. Each of the bills was sworn to by an officer of the corporation having knowledge of the facts. A restraining order was issued on the 30th of March, 1907, and the hearing for a preliminary injunction went over at the request of the respondents until the 8th of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

May, 1907. The respondents offered no evidence of any kind, and made no objection to the granting of a preliminary injunction, stating in open court they did not intend to appeal therefrom, if the court should grant a preliminary injunction. As a result of calculations based upon the figures and facts in the sworn bills, which were in no wise controverted, and after making due allowances for overestimates of the value of the property devoted to intrastate commerce, improper calculations, and the like, the court found, under the operation of the rates fixed by the statutes, that some of the complainants would not earn operating expenses, some a little above operating expenses, while the net earnings which any of the bills showed were at all probable under the reduced rates, judging from past experience, would not exceed 1½ per cent. per annum on the value of the property devoted to intrastate commerce. Thereupon the court, after exacting bonds as provided in the state statutes to refund any excess in rates to passengers and shippers if the complainants were cast in the suit, issued a preliminary injunction against the enforcement of the statutes mentioned above, and also made an order suspending the operation of the rate statutes as authorized by the state laws. Seaboard Air Line R. R. Co. v. Railroad Commission of Alabama (C. C.) 155 Fed. 792.

On August 14, 1907, the Louisville & Nashville Railroad Company and the South & North Alabama Railroad Company, amended their original bills, alleging, in substance, that the Governor had made various threats at various times and places, which were set out at length in the amended bills, that he would charge and instruct the several sheriffs and solicitors in the counties through which the complainants operated their roads to ignore and defy the orders of the court, and to arrest, indict, and prosecute their officers, agents, and servants for not observing the statutes, and that he intended to do so, and that these officers would obey the Governor's instructions in that regard unless restrained, and accordingly made the sheriffs and solicitors, though not the Governor, parties defendant. Four days prior to the filing of these amended bills, the Southern Railway Company had filed its petition for a modification of the injunction theretofore issued for its protection as to the freight and passenger statutes, formally setting forth in the petition, among other things, that in consequence of its removing a suit from a state to a federal court, under a statute so providing, against the execution of which no injunction had been issued, its license to do business in this state had been canceled, though that statute differed in no way from the statute the court had declared unconstitutional, except that the forfeiture was inflicted in consequence of removing a suit from a state to a federal court, while the statute declared unconstitutional inflicted the forfeiture for coming into a federal court to test the reasonableness of the rate statutes; that it had been "threatened by the authorities of the state with criminal prosecutions of itself, its officers, and agents in many different parts of the state at the same time," which would inflict irreparable injury upon it, unless prevented; that while the petitioner "did not recognize the legality or justice of the contentions of the state authorities," and had "not lost sight of the momentous nature of the claim asserted on the part of the state," yet, to avoid the injury which had resulted to it from a similar conflict with the authorities of the state of North Carolina, it had agreed "in the interests of order and peace" to test the rates, both freight and passenger, pursuant to a contract made with the Governor on the 8th of August, 1907, which was set out in extenso in the petition, and that in carrying out said contract, "following the suggestion made by the Governor," it applied to the court for such modification of the interlocutory injunction issued at the suit of the Southern Railway Company as "will enable it" to carry out said contract. The acts and threats of the state authorities, as shown in the petition of the Southern Railway Company, and by other facts of which the court could take judicial notice, coupled with the nature of the answers of the solicitors and sheriffs, left no doubt that it was their intention to defy the orders of the court made in the cases of these complainants. They did not deny that it was their intention to override the orders of the court, but objected to a temporary restraining order on the ground that the suits were, in effect, suits against the state, and that a court of equity had no jurisdiction to enjoin the prose-

cution in the name of the state of crimes, and thereupon the court granted the preliminary injunction against them. Louisville & Nashville Railroad Company v. Railroad Commission of Alabama et. al. (C. C.) 157 Fed. 944. Afterwards on amended supplemental bills the injunction was extended to the clerks of the several state courts. Western Railway of Alabama v. Railroad Commission of Alabama et al. (C. C.) 171 Fed. 694. On November 27 and December 2, 1907, the complainants filed supplemental bills setting forth certain statutes enacted at the Special Session of the Legislature called to deal with such of the complainants in the original bills as had not agreed to dismiss their suits and put the rates into effect by the 1st of October, 1907, on the terms and conditions agreed upon by the Governor and the Southern Railway Company. The supplemental bills set out the repeal of the 110 Commodities Act (Laws 1907, p. 209), and the enactment of the Eight Group Acts (Acts Sp. Sess. 1907, pp. 91–159) in lieu thereof, and a series of acts which need not be particularly noticed here which constituted a scheme or device to accomplish:

"(1) The taking away from the Railroad Commission and the Attorney General of all power and authority to enforce the statutory rate acts, so that the present causes of action will be abated as to them, and the injunction against them will be functus officio.

"(2) To make the charging by complainant of higher rates than those prescribed by the statutes of the state of Alabama punishable by heavy fines for each offense, which shall be enforced by civil suits against the complainant herein and other railroad companies similarly situated for forfeitures in the name of the state; the theory of this being that, the suits being brought in the name of the state, their prosecution cannot be enjoined in the federal courts.

"(3) To make the charging or exaction of higher rates than those prescribed by the statutes of the state of Alabama, by the officers, servants, and agents of the complainant, a misdemeanor, punishable by heavy penalties for each offense, so that the enforcement of these provisions of the law may be set in motion by undisclosed persons, by indictments, or by prosecutions in numerous different jurisdictions of the state.

"(4) To provide actions for damages by shippers and passengers who are charged higher rates of freight or passage than are prescribed by statute, which damages are to be assessed by jury, and may be brought in any county of the state through which the railroad company operates, and which shall not be barred until the lapse of many years.

"(5) To make the penalties and forfeitures in actions for damages so large in amount, and so numerous, and enforceable at the same time in so many different jurisdictions, that this complainant and others similarly situated will be forced to submit or wager all of their property on the result of the litigation, and so that they shall be embarrassed by the enormous amount of litigation encouraged and instituted by the statutes, that they will be forced to put the rates into effect without a judicial determination as to their constitutionality and validity.

"(6) To repeal existing laws, which provide for a remedy, and to substitute in their place a law which purports to give a remedy in the state court, but which gives the remedy only by appeal from an order of the Railroad Commission increasing or reducing rates, or refusing to increase or reduce rates, and gives it in such a manner as to practically make submission to the rates pendente lite a condition precedent.

"(7) To repeal the rate statutes which are attacked by the original bill of complaint in this cause, and to enact in their places statutes which purport to enact different rates (but which in reality and effect, are but re-enactments of the old statutes, with immaterial modifications) the theory being that by this method the cause of action of the original bill of complaint in this cause, and of other similar bills will be abated thereby, and the jurisdiction of this honorable court defeated and destroyed.

"(8) At all events, to defeat the jurisdiction of this honorable court in these present cases, and to make it impossible for the complainant, and others similarly situated, to proceed at all in the federal courts in Alabama."

The supplemental bills assailed the Eight Group Acts on the same grounds

as the repealed acts for which they were substituted, and averred that prior to the special session and the passage of the acts at that session the Southern Railway Company, the Alabama Great Southern Railway Company, and the Mobile & Ohio Railroad Company had made contracts with the Governor, whereby their original classification was changed, and they were permitted to charge higher rates for the transportation of passengers and freight than were accorded under the statutes to these complainants, who were in all respects similarly situated with the favored roads, and thereby denied to the complainants the equal protection of the laws, and also that the classification made of the several railroads in the acts of the Legislature at the special session were arbitrary and unjust, etc.; that the rates prescribed in the classification in the acts at the called session would not permit a fair and just return upon the value of their property devoted to intrastate commerce, deprived complainants of their property without due process of law, etc., amounted to a regulation of interstate commerce, wherefore they prayed a preliminary injunction against the execution of the statutes recited, and that on final hearing the injunction be made perpetual. A restraining order was issued, and the matter came on for hearing on motion for a preliminary injunction. Thereupon elaborate oral arguments were heard as to jurisdictional questions raised by respondents, and as to the effect of the volume of testimony as to the reasonableness of the rates which was submitted in the shape of affidavits and counter affidavits in reply and received by the court up to the time of its decision.

The court having reached the conclusion that the complainants, under the conditions existing in Alabama, were entitled to earn from their business, the charge for the service being reasonable in itself, a net profit of 8 per cent. per annum on the value of their property devoted to intrastate commerce, found, after a painstaking examination of all the affidavits, which made a pamphlet of several hundred printed pages, and giving due weight to the presumption of the reasonableness of rates fixed by statute, and allowing for errors in bookkeeping, excessive valuations, and considering business conditions, that none of the complainants would receive as much as half of the sum as they were entitled to earn upon the value of their property employed in intrastate commerce, and that some of the complainants would conduct their business at a loss. The country was then suffering from a depression and panic which affected all branches of business. On the proofs made to the lower court, it seemed plain to it the operation of the reduced rates would be confiscatory, and this on the proof was so manifest that the consideration of the question did not involve any of the matters of doubt or uncertainty which would justify the court in refusing an injunction until it had tested the rates by a trial of them. Accordingly it issued a preliminary injunction against the enforcement of all of the statutes assailed in the bills. Central of Georgia Railway Company v. Railroad Commission of Alabama et al. (C. C.) 161 Fed. 925.

The defendants appealed from each of these interlocutory injunctions. The decision of the Supreme Court in Ex parte Young, 209 U. S. 123, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, handed down about the time the Circuit Court granted the preliminary injunctions, settled adversely to the respondents all their contentions as to the jurisdiction of the court and its right to enjoin criminal prosecutions and arrests for violations of the state statutes pending the final hearing, and to prevent the prosecution of civil suits in other courts to determine the question of which it had obtained exclusive jurisdiction upon the filing of the bills. That decision was followed, of course, by the Circuit Court of Appeals. It held, however, that the lower court erred in holding that an unauthorized delegation of legislative power had been attempted within the meaning of the Alabama Constitution as construed by the state Supreme Court, when power was given the Railroad Commission to change classifications and rates fixed by the Legislature itself "from time to time as conditions may in its judgment render it expedient or proper to do so." The majority of the Court, Pardee, Presiding Judge, dissenting, held for the reasons stated in the opinion (Railroad Commission of Alabama et al. v. Central of Georgia Ry. Co., 170 Fed. 225, 95 C. C. A. 117) that the lower court erred in not directing an actual test of the rates before

issuing a preliminary injunction. Thereupon these cases were referred to W. A. Gunter, as special master, to take testimony and report his conclusions on the law and the facts together with a transcript of the proof taken before him. The master was directed to report upon the following matters:

"(1) The original cost of construction of the railroad and properties used by complainant in its business as a common carrier in the state of Alabama or contributing thereto.

"(2) The amount expended thereon in permanent improvements since the original construction.

"(3) The character of said permanent improvements and the amount expended for such permanent improvements.

"(4) The amount of expenditures for permanent improvements and additional equipment, separately, charged to operating expenses each year ending June 30, 1907, 1908, 1909, and up to the latest date practicable prior to the making up of his report.

"(5) Whether the expenditures for the construction and improvement of said property were economically and properly made.

"(6) The amount, par value, and average market value of complainant's bonds and stock during the years ending June 30, 1907, 1908, 1909, and the proportion thereof apportionable to the business in Alabama, and up to the latest date practicable prior to the making up of his report.

"(7) The amount of, and actual consideration received for, each issue of bonds and stock.

"(8) The amount of bonds and stocks and the amount of proceeds of stocks and bonds used in acquiring the securities of other railroads and corporations and in acquiring property not used in its business as a common carrier.

"(9) The net amount of cash received for its outstanding bonds.

"(10) The net amount of cash actually received for its outstanding stock.

"(11) The amount of fixed charges payable annually upon the bonds of the company, the rate of interest payable on each issue of bonds, and whether said bonds were disposed of at their reasonable market value and the net proceeds devoted to the construction and improvement of complainant's railroad and to acquiring equipment and other property for its operation.

"(12) What, if any, sum should be deducted for depreciation of the property from the cost thereof and from the cost of reproduction.

"(13) The value of complainant's franchises and intangible property in Alabama as a common carrier, and the part thereof apportionable to the intrastate business in Alabama.

"(14) The cost of reproducing the line of railroad and other railroad properties used by complainant in Alabama in its business as a common carrier.

"(15) The present reasonable value of the rolling stock or equipment owned and used by complainant in its business as a common carrier in Alabama during each of the years ending June 30, 1907, 1908, 1909, and up to the latest date practicable before the making up of his report, and the percentage of depreciation from 100 per cent. new that has taken place in such equipment, and the amount, if any, that should be deducted for depreciation of such equipment or rolling stock owned and used during said periods.

"(16) The number of each kind of equipment or rolling stock on hand at the end of each of the fiscal years ending June 30, 1907, 1908, 1909, and up to the latest date practicable before the making up of his report, and the number of each kind destroyed, worn out, or sold and replaced during each of said years.

"(17) The sums expended in each of said years for additional equipment acquired over and above what was necessary to replace destroyed or worn out equipment, and charged to operating expenses.

"(18) The total present reasonable value of all the railroad properties operated or used by complainant in Alabama, including its franchises, the value thereof devoted to intrastate business, and the value thereof devoted to interstate business.

"(19) What per cent. upon the value of the property devoted to intrastate business in Alabama or other sum complainant is entitled to earn from its intrastate business in that state, in excess of its operating expenses and taxes.

"(20) The gross earnings per annum from the operation by complainant of

its railroad properties in Alabama during the fiscal years ending June 30, 1902, 1903, 1904, 1905, 1906, 1907, 1908, 1909, and up to the latest date practicable before the making up of his report, and showing, as nearly as practicable, what part of said earnings from Alabama business was derived from intrastate business during the years 1906, 1907, 1908, 1909, and up to the latest day practicable, and also for the years 1902, 1903, 1904, and 1905, if the books kept for such years now show such facts, and what part thereof was derived from interstate business. Also complainant's income, from all other sources and all proper charges against said income, and the proportion of net income from such other sources, if any, that should be credited to the total business in Alabama, and what part thereof should be credited to the intrastate business in Alabama.

"(21) The operating expenses and taxes expended and properly charged to operating expense account for and on account of the business in Alabama for each of the years ending June 30, 1906, 1907, 1908, and 1909, and up to as late a date as practicable, and showing as nearly as practicable what part of said operating expenses and taxes expended on account of Alabama business was expended in the conduct of its intrastate business, and what part thereof was expended in the conduct of its interstate business, and the cost, if any, of earning a dollar from intrastate business in excess of the cost of earning a dollar from all business in Alabama during those years.

"(22) Whether during said years complainant's roads have been prudently and economically managed.

"(23) The loss in earnings, if any, from the operation of complainant's lines in Alabama which complainant would have sustained from April 1, 1907, to May 31, 1909, inclusive, had the statutory rates complained of been put into force and effect during that period, assuming that the same number of tons of the commodities affected by those rates, and the same number of passengers would have been carried the same distances during said period if said rates had been in force.

"(24) To what extent, if at all, the gross and net revenues of complainant from intrastate business in Alabama have been affected, or its intrastate business, in number of passengers and passenger miles and in revenue, has been increased or diminished by reason of the statutory passenger rate of 2½ cents complained of, considered independently of the statutory freight rates complained of.

"(25) Whether the reduction of rates to those prescribed by the statutes has operated to stimulate or depress complainant's intrastate business in Alabama, and to what extent, if any, the business has increased or decreased by such reduction of rates, with the reasons upon which his conclusions are based.

"(26) The total loss of earnings, if any, which complainant has sustained from June 1, 1909, to the latest date practicable prior to the making up of his report, on account of having put in force and effect the statutory rates or any of them complained of.

"(27) The ratio between proper and legitimate operating expenses and gross earnings in 1902, 1903, 1904, 1905, 1906, 1907, 1908, 1909, with respect to the entire business in Alabama, and with respect to the intrastate business in Alabama, for each fiscal year ending June 30, 1906, 1907, 1908, 1909, up to the latest date practicable, and for the years 1902, 1903, 1904, and 1905, if the books of the company so kept during said years now show that fact, and whether such ratios will probably be increased or diminished in the future, and whether the gross and net earnings will be probably increased or diminished in the future.

"(28) The separate ratio between the net earnings from the entire business in Alabama, and likewise between income from all sources, and the value of the entire property devoted to the entire business in Alabama, and between the intrastate business in Alabama, and likewise between income from all sources assignable to such business, and the value of that part of the property devoted to the intrastate business in Alabama, for each fiscal year ending June 30th, as designated in the next preceding clause.

"(29) The separate ratio between the net earnings from the entire business in Alabama, and likewise between income from all sources assignable to

Alabama, and the proportion of the capitalization properly assignable to Alabama, and between the net earnings from intrastate business in Alabama, and likewise between income from all sources assignable to such business, and the proportion of such capitalization properly assignable to intrastate business in Alabama, for each fiscal year ending June 30th, as designated in the second preceding clause.

"(30) The separate ratio between the net earnings from the entire business in Alabama, and likewise between income from all sources properly assignable to Alabama, and the actual sum expended in the construction and permanent improvement of the property in, or used in the business, in Alabama, between the net earnings from intrastate business in Alabama, and likewise between income from all sources properly assignable to such business, and the actual sum expended in the construction and permanent improvement of that part of the property used in Alabama devoted to the intrastate business in that state for each fiscal year as to which evidence shall be offered, as designated in the third preceding clause.

"(31) What difference, if any, exists or existed in the character of the several railroads doing business in Alabama, or in the character or extent of the several businesses they were or are engaged in, or in any other circumstances having a relation to the subject, including gross earnings and net earnings as shown by their reports and the value of their properties used in their business as a common carrier in this state, justifying or not justifying the several classifications made by the Original Commodity Act or by the Eight Group Acts passed by the Legislature of Alabama, approved November 23, 1907, with reference to the rates which said several railroads, were, by said acts, and subsequently by the several orders of the Railroad Commission of Alabama, allowed to charge for the transportation of certain articles or commodities of intrastate freight in Alabama, or justifying or not the several orders of the Railroad Commission of Alabama allowing some of said roads to charge for the transportation in Alabama of intrastate passengers higher rates or fares than others of said railroads are allowed by the act of the Legislature of Alabama to charge for the same or like service or services."

The reports of the master in the Louisville & Nashville Case and the South & North Alabama Case were filed on the 1st day of September, 1911, and in the Nashville, Chattanooga & St. Louis Case his report was filed on the 7th of September, 1911. Exceptions to the reports of the master were filed by the respondents and complainants in each case in October, and the cases came on to be heard and were argued by counsel in November, 1911. Each of the cases was then submitted for final decree upon the exceptions to the master's reports and the evidence reported by him. The evidence before the master, exclusive of exhibits, consisted of 14,112 pages of typewritten testimony. Besides the oral argument, the court has been favored with voluminous printed and typewritten arguments, and it has carefully gone over the contentions raised by the counsel for each side.

The master reported that it appeared from the evidence that the effect of the state rates was to reduce the standard rates prevailing at the date of the passage of the state statutes from 10 per cent. to 40 per cent. of the rates on the articles affected by the statutes, and that the allowance of such cheaper rates to and from points such as Mobile and others, shipping merchandise to the interior and receiving merchandise from the interior for shipment to ports and points outside of the state, would and did divert interstate commerce coming into the state and going out of the state through such points as Pensacola and New Orleans and other cities accustomed to handle interstate commerce having a terminus in Alabama to Mobile and other state towns, thereby compelling the interstate carrier transporting merchandise to and from Pensacola and New Orleans and other outlying towns to reduce its interstate standard rates to correspond with the state reductions or to lose the business so affected by the state reductions of freight. And the master held and reported that the actual and necessary effect of the state so fixing lower rates for intrastate commerce was to directly control and interfere with the interstate commerce of the complainants.

And the master further held and reported that, when the Interstate Commerce Commission fixed or accepted the rates fixed by the roads for transpor-

tation which was interstate commerce on the complainants' roads the rates for intrastate commerce on the same road was necessarily thereby determined, because the units of transportation on all roads are identical, whether they appertain to inter or intra state commerce as to every element of value; thus that, as there is no difference in transporting a passenger or a ton a mile which is interstate commerce and a similiar passenger and ton when the commerce is strictly intrastate, there can be but one natural relation of value between service and compensation, and, where the supreme power determines that relation in interstate commerce, the state is impotent to make rates on a different relation: that, as there cannot be different values and thus rates under the same or similar circumstances for the same or similar transportation. the fixing of interstate rates automatically determined the intrastate rates, and took that matter out of control by the state. In determining the value of the proportion of the property devoted to intrastate service, the master adopted the view and reported the reproduction value less accrued depreciation as the best and most reliable criterion of present values. And in finding this cost of reproduction the master held and reported that the values must be taken as of the date of the inquiry notwithstanding the great advancement of rates since the original construction. And, it being shown that the complainant had large trackage rights without the ownership of the property, the trackage right was valued and allowed on the basis of the capitalization of the rents paid for such trackage. In the case of property situated in another state, such as shops, shop machinery, and tools, and of office buildings used jointly for the system or for several complainants or companies, whether in or out of the state, and of equipment used jointly, whether belonging wholly to one or several, and in or out of the state or both, the same were apportioned according to the use of each line of such property and, in that way, the share of the Alabama lines were ascertained and valued.

Interest was allowed on the capital necessary for reconstruction for half the estimated period required for construction, and while deterioration was deducted, there was an allowance for shrinkage or "seasoning" as it is called by the witnesses. The evidence showed that the complainants in operating their roads were compelled to have and keep on hand a large amount of current assets, such as magazines of coal and material of every kind, and of cash to meet readily current demands. It was shown that income was always in transit both ways to and from the treasury, and that it was unavoidable in doing business to have a large amount of assets in bills and accounts receivable.

All these items made up a single one called "Current Assets," and such as were the inevitable concomitants of operations were allowed by the master as a part of the reproduction value, on the theory that the natural operation of the business absorbs and forces capital into the forms and in the amounts shown, and that it thus became property devoted to the business as much as the rails of the tracks; the volume being constant though the items are current. The value of the property devoted to public use as a common carrier being thus ascertained, the next question was the apportionment of the same between the interstate and the intrastate service.

The evidence showed that the whole property was used in common for the two services. There could thus be no division between the two without some apportionment measured by and according to the relative use made by each service. The proof showed that there was a large difference between the cost of doing the inter and the intra commerce arising from the fact that the intra is local with short hauls and light loads and two terminal charges for each shipment, while the inter is of longer hauls with fewer stops and fuller loads and smaller crews, and with one terminal charge to the shipment. To make an apportionment possible, the proof showed what the relative operating revenues were for each service, and the opinions of experts was introduced as to the relative difference of the cost of the interstate and the intrastate service. The testimony as to this difference was very variant, some of the witnesses placing the cost of the intra over the inter as being 10 per cent. to 15 per cent., others as high as 200 per cent. or more than that of the inter. Taking 25 per cent. as the true or best sustained differential amount to be

added as a loan to the intra for the purposes of equalization for the comparison, tables were exhibited on that basis, showing the proportion of the whole property devoted to each service on the relative gross revenue basis. But the complainant undertook to show the relative cost of the two services by reference alone to the actual cost of operating each service. The proof showed that by means of a large force for a period of one week, shown to be a fair period, the actual cost for each item of service was accurately ascertained by actual allocation when possible, and, where this was not possible by apportionment, by competent persons familiar with and superintending the business. On this basis the actual relative difference in cost was also ascertained.

Then there was evidence of algebraical calculations on the actual and accurate figures of the proper bookkeeping of the relative revenues, and the total costs of the different divisions of the road in which the per cent. of the inter and intra commerce varied, from which the actual relative cost of the two services were demonstrated, the results of which confirmed the basis set up by complainants on the actual cost of doing the service, which is called the "unit of service basis," and is fully explained in the report of the master. The proof also showed by analysis of the revenues and expenses of the various divisions of complainant's road that just in proportion as the per cent. of intrastate commerce compared to the interstate predominated in the divisions the relative costs of earning a dollar in such divisions increased. And the difference in the relative cost of earning a dollar in interstate and intrastate was in this manner shown to confirm the results obtained by the application of the unit of service basis. The results of this experiment on the unit of service basis was also confirmed by the opinion of experts and was adopted by the master and applied to equalize the ton and passenger miles and traffic of the interstate and intrastate commerce for the purpose of comparison. In this way the proportion and the value of the property assignable to each service was determined.

The next step was to divide the revenue and expenses between the inter and the intra state commerce so as to determine the net income on the value of the property of each devoted to public use as a common carrier. As to the revenue, the proof showed that accurate accounts were kept separately for the inter and intra so far as the same could be allocated, but some items not being susceptible of such division had to be apportioned on some basis. One of these was the income from transportation of the mails. The complainant divided this income between the inter and intra state traffic according to the routes or nature of the contracts; that is, if the contract was one to transport between intrastate points, the income was allotted to the intrastate business. And, if the contract was interstate, the income was given to the interstate business. Other modes of division were suggested by respondent, but the master held that the mail service, including its income, was a matter strictly interstate, and that no portion of the income should be given to the intrastate business, and, as a large part of this income was allotted to the intrastate on the basis adopted by complainant when none was due, overruled the objections of respondents, and accepted the division made by complainant on the basis above stated.

The proof showed that many divisions of the road overlapped state lines, that is, were partly in different states, and that the revenue from interstate shipments was kept in the aggregate for the whole division, there had thus to be an apportionment of the interstate revenue between the portions of the division in and out of the state. The master held that the revenue arising from interstate commerce should be divided on the basis of the train mileage of such divisions in and out of the state. It appeared that the operating expenses of such overlapping divisions were charged on the basis of the train mileage in each state of the inter and intra state business on such divisions. The proof showed, also, that this was the accepted mode of division by the National Association of Railway Commissions, and it further showed that a division of both expenses and revenue on the train mileage basis would increase instead of diminishing the interstate revenue. The proof showed that charges were made each year against gross revenues to meet reclamations or refunds for overcharges of previous years, and, that cur-

rent years got the benefit of current overcharges. The proof showed that on the average these annual receipts of overcharges and current payments of refunds about balanced each other year by year, and that this was the only practical way of doing the business, since the actual overcharges for any current year could not be ascertained during such year, so as to be charged against the gross revenues of such year. So the practice was established as a necessity of making the current year pay refunds actually made during that year, though resulting from the operation of previous years, and balancing this by giving to the current year the benefit of current overcharges as part of its income.

In the distribution and allowance of expenses between inter and intra business, many objections were interposed to the methods of accounting. It was insisted by respondents that the expenses of overlapping divisions—that is, those having terminals—in different states should not be apportioned between the states on the train mileage in each state. But the proof showed that the expense accounts were kept by divisions, and that the relative use in the several states was better reflected by the relative train mileage in the several states than otherwise and the accepted mode of accounting by railroad accountants was by that method, and so it was adopted by the master. The items of depreciation to be deducted were very large. The proofs showed that up to the 30th of June, 1907, the railroads kept no depreciation accounts. As structures or equipment were worn out or replaced, the cost of replacement was charged to the operating expenses. After June, 1907, depreciation accounts as to equipment were required to be kept and were authorized as to way and structure. After this charges to operating expenses to cover improvement account ceased.

The master held that it made no difference in estimating the present value of the reproduction basis how the accounts for depreciation had been kept or paid, that the capital account represented by the structure new, that is at 100 per cent., was necessarily reduced by the depreciation of the property reflecting the investment, and that it had to be kept at par by charges that directly or ultimately must be against the income, and that the adjustment made by complainants which ultimately carried all expenditures of value as a charge into the expenses of operation was correct. The master held that depreciation was not a disposition of part of the profits, but an expense which must be paid before the profits can arise, and that it made no difference whether the instrument of production was used up in a day or year or through a series of years, except in the mere form of the accounting, a single use being chargeable as an operating expense, as coal for fuel, and the annual expense being charged as an expense of the year, as taxes, the use requiring a series of years to exhaust the instrument of production being spread over the accounts of its expected life by annual charges to raise a depreciation fund as a liability against the company until it is credited on the retirement of the instrument with the whole original cost less the salvage value, as in case of bridges, rails, and equipment, and that the accounts of the complainant, being after this method, were correct.

It was insisted by respondent that interest should be allowed against the complainant on the accumulation balances in replacement accounts, as being that much idle cash derived from income which the complainant had had the use of, and should therefore account for interest. The master, however, held that the entire capital of the company had been used from the date of investment without any interest charge, and that the balances in the replacement account only represented the actual annual depreciation as estimated to keep the capital at 100 per cent., which were merely suspended in actual application until retirement charges against such replacement accounts were made; that the company paid or was supposed to pay stockholders income on the whole capital at 100 per cent. in lieu of interest, and was thus entitled to keep and use replacement balances without interest as part of the capital itself until paid out on assuming the form of structures and equipment. In the separation and dividing of operating expenses between inter and intra state traffic, the complainant proceeded upon what is called the "unit of service basis." This, as explained in the proofs, is an effort to divide operating expenses between the two traffics without refer-

ence to revenue, but entirely in reference to the cost of the service rendered or required. This is upon the idea that, as the cost of intra service in the aggregate is greater than the interstate, the one service requires a greater use of the property than the other per dollar earned, and therefore that this use cannot be reflected in their respective tons and passenger miles or revenues for any purpose of comparison, without the ton and passenger miles being equalized, so that their respective quantities may be compared to establish the proportion of the property used by each to earn its respective revenue. The plan of the unit of service basis is set forth in the resolution of the accounting officers of the litigant railroads in conference held at Atlanta in September and October, 1909, which was put in evidence, as follows: "Resolved, that, in the separation of operating expenses as between interstate traffic and intrastate traffic upon a unit of service basis, freight and passenger expenses should first be divided as between haulage and nonhaulage items and general expenses, and that freight haulage items should be apportioned to interstate and intrastate traffic on basis of the number of ton miles in each class, equalized or adjusted to local conditions; that freight nonhaulage items should be apportioned on basis of tons so equalized or adjusted; and that the general expenses should be apportioned on basis of haulage and nonhaulage items so divided; and that passenger expenses should be similarly divided on basis of equalized or adjusted passenger miles or passengers."

The proof showed that all expenses were first divided into passenger and freight, and then the passenger and freight into haulage and nonhaulage costs, and then separately the passenger haulage and nonhaulage and freight haulage and nonhaulage into interstate and intrastate. This distribution of operating expenses between interstate and intrastate haulage and interstate and intrastate nonhaulage were made on the basis of equalized ton miles and equalized passenger miles for the division of haulage expenses, and on the basis of the ton terminals and passenger terminals for the division of nonhaulage expenses, on the proof and theory that the cost of services in railway transportation is the expense of the two terminals and the intermediate haul. The equalization of the ton and passenger miles of the inter and intra was effected by the multiplication of the intrastate units by the percentage which the haulage costs per intrastate unit were ascertained to be of the haulage costs per interstate haulage unit in the special test which was made for that purpose. The equalization of the passenger and freight nonhaulage expenses were made on the basis on ton terminals and passenger terminals; the relation of interstate and intrastate nonhaulage costs being shown to be in the relative number of terminals within the state, an actual count being made of the terminals of interstate and intrastate units during two months of each fiscal year. It appeared in proof that it costs as much to earn a dollar in the passenger business as in freight. And on this basis the total inter passenger and freight expenses haulage and nonhaulage were combined for a total of inter expense in earning the inter revenue, and, in like manner, as to the intra expenses.

The relative totals of expenses for inter and intra state traffic were increased by the charge for depreciation of way and structures shown by other tables, and the inter share and the intra share for each year were added to the respective totals as above found for the relative grand totals of inter and intra expense. And these totals, being applied to the revenues earned, revealed the proportion of the property assignable to each and the relative cost of earning a dollar in inter and intra state traffic, corresponding with all other estimates made, including the algebraical and analytical tests.

The facts relating to other matters sufficiently appeared in the opinion.

Henry L. Stone, Gregory L. Smith, Sidney J. Bowie, W. A. Colston, and George W. Jones, for complainants.

R. C. Brickell, Atty. Gen., Henry C. Selheimer, and S. D. Weakley, for respondents.

JONES, District Judge (after stating the facts as above). As appears from the statement of facts and the master's reports in these

cases, they involve the same principles of law and in general the same state of facts, varying somewhat in details in the different cases. They may, therefore, be disposed of in one opinion. After painstaking consideration of the record in each of them and the arguments of counsel, I have reached the conclusion that the rates complained of must be annulled, first, on the ground that in the classification of the railroads in Alabama for rate-making purposes and in the administration of the statutes each of the complainants were denied the equal protection of the laws; secondly, because the rates on the proof and in view of the value of the property devoted to intrastate business and the returns allowed therefrom by the rate statutes were confiscatory, and deny to complainants that just compensation for the use of their properties to which the Constitution entitles them.

## Classification of the Roads.

[3] The classification of the railroads in Alabama in the original act of March 2, 1907, and of the subsequent Eight Group Acts, approved November 23, 1907, is substantially the same; and, as the original act was repealed, it is necessary only to notice that of the later acts. The statutes fix maximum transportation rates on 100 or more of the commodities in common use, and constitute a considerable proportion of the transportation by the railroads of the state. The railroads are divided by name into four classes—numbered 1, 2, 3, and 4—and the maximum rates are fixed by schedules to each of said acts for the different commodities for different distances of transportation, whether in car load lots or otherwise. Class 1 is allowed to charge the maximum rate plus 5 per cent. Class 2 is allowed to charge the maximum rate plus 20 per cent. Class 3 is allowed to charge the maximum rate plus 25 per cent. Class 4 is allowed to charge the maximum rate plus 50 per cent. Acts of Alabama 1907, pp. 91–159. A small number of the commodities thus regulated as to rates are not subject to the percentage increase on the maximum rate. By section 2 of said acts it is provided that when any railroad in class 1, or which may thereafter be placed in class 1, shall own or operate any other railroad in whole or in part, or shall own a majority of the stock of another railroad, such railroad whose stock is thus owned or whose road is thus operated shall itself be put in class 1, and be allowed to charge only the rates of that class. The basis upon which the railroads were classed is not disclosed by the act itself, or by the proof adduced in the cases. It is seen that the difference in the allowed freight charges between class 1 and class 4 is 45 per cent. of the maximum charge allowed class 1. And the differential in favor of class 3 over class 1 is 25 per cent., and the differential in favor of class 2 over class 1 is 20 per cent. These differences are quite substantial. They are sufficient in many cases to absorb the entire net income available for returns to stockholders.

[1] The power of the government to regulate railroads to preserve the just relation between the public and the corporations serving it is undoubted. The right of the public is to have reasonable and uniform rates. The right of the railroads is to have an equal protection

of the laws with citizens generally and fair returns on their investments. Gulf, Colorado & S. F. Ry. v. Ellis, 165 U. S. 150, 17 Sup. Ct. 255, 41 L. Ed. 666; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819.

[2] The principles governing the right to classify railroads for the purpose of prescribing rates are somewhat similar to those applicable to their classification for levying taxes. In the exercise of this right, in either respect, however, the classification must have regard to, and be based on "some real and substantial distinction bearing a reasonable and just relation to the things in respect to which such classification is imposed." Gulf, Colorado & S. F. Ry. v. Ellis, supra; Southern Railway v. Greene, 216 U. S. 417, 30 Sup. Ct. 291, 54 L. Ed. 536, 17 Ann. Cas. 1247. Rates on railroads are intended to cover operating expenses and returns to stockholders. Whether or not a given charge for a given service is proper must be determined after ascertaining whether the charge is reasonable in itself by the cost or expense to the owner in rendering the service and the income derived thereon from a given rate, and whether when taken with its income from all other rates the carrier receives a just return upon the property employed in the public service. The different situations and conditions under which different roads are operated justify different rates on them, but whenever railroads are substantially in the same class and conducted under the same surroundings, with the same hazards and drawbacks in their business, then the rates fixed by law upon them must be the same, and discriminations between them in this respect must be based upon some real substantial difference and not by reason of arbitrary selection, whereby burdens are placed upon one and benefits conferred upon another when relatively the different roads occupy the same substantial relation; otherwise equality before the law would be a myth in many cases, and the equal protection of the laws would consist in sound, rather than in substance. It may be conceded that the Legislature for rate-making purposes may set apart and classify railroads by name merely. Such exercise of power is upheld "upon the idea that there has been precedent investigation, or that there exists such a familiarity with the characteristics and subjects of classification as enables the Legislature to classify by name on proper distinction." Minneapolis & St. Louis Rd. Co. v. Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151. The grounds of the classification must be such as are discoverable and understood to be reasonable on full investigation by competent persons, otherwise every and any legislative classification would be unimpeachable, no matter how grossly arbitrary it might appear to the understanding.

The complainants insist that the classification of the railroads for rate-making purposes under the statutes referred to is arbitrary, and unjustly discriminatory, and is not based on any just relation between the railroads of Alabama which could fairly and honestly justify the classification, whereby complainants are denied the rates accorded to other roads of the same or a higher class. It is difficult to understand the theory upon which the conclusion was reached that a railroad put, say in class 4 by the statute because of its bad loca-

tion, poor business, cost of production, maintenance, etc., and which on that account is justly allowed to charge more for service than a road more favorably situated, should automatically have its income lessened and its charges reduced because it had been purchased by a first-class railroad, and its classification as to rates altered to its own hurt by the action of a third party over which it had and has no control, and whose act in purchasing or leasing the road did not and could not possibly alter in any way the relation of any of the things upon which any just classification alone must rest. Section 2 of the Eight Groups Acts does this, and the result of it is in these cases that the Nashville, Chattanooga & St. Louis Railroad, which is rated by name in said acts as belonging to class 2, is ranked in class 1, because the Louisville & Nashville Railroad Company owns a majority of its stock, when, in fact, it does its interstate business at a loss, and when it ranks ninth on a basis of net earnings on all business.

Ownership of stock can, of course, have no relation to the quality of a road or the cost of transportation, or change or affect in any way the elements of the cost of the services rendered in the transportation of passengers or freight, and any classification on a basis of stock ownership is inherently and obviously wrong. But section 2 of the act is now a matter of secondary importance. The original classification embraces by name the various railroads of the state, and the witnesses examined, all of whom were familiar with the characteristics of all of the roads, were unable to discover any basis whatever, having a relation to differences between their conditions, which could have been adopted by the Legislature for its classification. They testify that there does not exist any facts or fact in the nature, condition, or history of complainants' roads which could justify the classification of the statute. They show that the Louisville & Nashville in Alabama consists largely of branch lines which are unproductive as compared to other roads allowed to charge from 15 per cent. to 45 per cent. more than it; that it ranks fourth in net earnings per mile on all business and is classed "1" by the statute, while other roads, such as the Alabama Great Southern, ranking third in net earnings per mile, is classed "2." It is further shown that the net earning basis is not a rational one for classification, since it offers a premium for bad management. Roads may be alike in all particulars, and yet the management may make one prosperous and the other insolvent. Good management, therefore, should not cause a difference in the rates allowed. And, besides, the net earnings per mile of all business includes interstate commerce, which may create all the difference in that regard between the roads, and, of course, such differences thus arising cannot be the basis of classification for intrastate rates. And the same argument applies to classification on gross earnings per mile. It is shown, too, that the difference of the cost of construction and of maintenance cannot have been the basis of classification, since other roads costing less to construct and maintain than complainants' are put in classes 2 and 3 and allowed to charge from 15 per cent. to 25 per cent. more than complainants' which are put in class 1. It is shown that the Louisville & Nashville and South & North Alabama railroads

are well and prudently managed, and render better service, and cost relatively more to construct, and now cost more to maintain than other roads, but are compelled by the statute classification to charge less than such other roads, and that the Nashville, Chattanooga & St. Louis Railroad, which ranks in every physical and earning feature as to intrastate business below the roads in classes 1, 2, and 3, is forced to charge rates on the basis of being in class 1; that is to say, from 15 per cent. to 25 per cent. less than the roads in classes 2 and 3.

And the administration of these rate statutes, after their passage by the Legislature and by its consent under the direction of the Governor and through the orders of the Railroad Commission of Alabama acting in conjunction as the administrative officers of the state, has been unjustly discriminatory against complainants. A number of the railroads in the state filed similar bills to those of complainants attacking said rate statutes on the same grounds as complainants' bills. Afterwards such roads entered into agreements with the Governor of the state that, upon the dismissal of the bills of such complaining roads, they should be put in classes more favorable for charging rates. These agreements were carried out, and under them roads possessing equal or superior qualities to complainants' in all characteristics upon which roads might be reasonably classified for rate making, such as cost of construction, cost of maintenance, earnings gross, and net per mile, were further classified more favorably for rate charges on freight business than they were in the statutes themselves, and were allowed to charge 2¾ cents per mile for passengers, while complainants, having the characteristics as to such matters inferior to the favored roads, were forced to charge only 2½ cents per mile for passengers, and freight rates from 15 per cent. to 25 per cent. lower than such roads. These agreements were made in consideration of the abandonment by the roads having the benefit of them of the right to litigate in the courts of the country the constitutionality of said rate statutes. There was and could be no legitimate reason or consideration moving between the favored roads and the state or its officials which could justify a classification for rate making to the prejudice of the complainants. Complainants being competing carriers, any classification which places equal roads in unequal positions, or unequal roads in equal positions, as to freights or reverses the natural relation of roads to the disadvantage of complainants, infringes their constitutional right to the equal protection of the laws. All this was done in these cases to the prejudice of the complainants by the classification of the rate statutes and the administrative application of the policy of the statutes through the Governor and the Railroad Commission of the state of Alabama, contrary to the Constitution that neither enactment nor administration shall infringe on the right and privilege of equality before the law. No sufficient reason or excuse for these discriminations against complainants is shown, while the reasons against the same are cogent and apparent. It cannot be gainsaid, therefore, that no reason exists except that founded on want of information or other insufficient moving cause, not recognized in dealing with constitutional rights. Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220.

It is insisted, however, by counsel that the presumption in favor of legislative action furnishes a sufficient reason for the classification, and that the complainants must prove the negative that there was and is no just and rational excuse or reason for the classification with that particular degree of certainty which pertains to an affirmative issue and which excludes every conclusion, and they carry this contention so far even as to require the proof to exclude by negation the existence not only of all substantial reasons, but of fanciful, immaterial, and even impossible data. The ordinary and general rule is that negative averments in pleading do not have to be proved by the plaintiff unless his cause of action is founded on and grows out of the negative allegation, and then the plaintiff has only to establish his averment by the usual measure of proof required in civil suits according to the nature of the issue. 1 Greenleaf, Evid. §§ 78–80. In such cases the plaintiff certainly cannot be required to negative "beyond a reasonable doubt" either all or any immaterial or all or any impossible facts. We repeat, it is evident that the classification of railroads for rates must be based on some substantial difference between roads relating to the necessity and propriety of making differences between them in rates to be allowed, such, for instance, as the relative cost of production and maintenance of the roads and the probable gross as well as net income on given rates, which necessarily require the consideration of, and allowance for, every possible factor influencing such results. No other circumstance can be suggested as proper upon which to base a classification, except on the idea that it indicates and involves those just mentioned. Thus, if the length of the road is adopted, it is on the idea that the greater length implies a greater ability to produce earnings than shorter roads; but the presumption cannot be indulged against the proved facts contradicting it. The respondents suggest that net earnings per mile on all business might have been the basis, and they have constructed tables showing net earnings. But the proof shows that not a dollar of these net earnings is intrastate, and, of course, interstate net earnings can be no basis for intrastate rates or classification for intrastate rates. Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; Minneapolis & St. L. Rd. v. Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151.

It is next insisted that net intrastate earnings might have been the basis of classification, and that there is no evidence on this as to the several roads classified, but there is no bookkeeping by the roads or other persons or proof showing net intrastate earnings. There is no bookkeeping which could show net intrastate earnings of a railroad engaged in both interstate and intrastate commerce. The separation of the cost of interstate and intrastate service is an impossible problem. The counsel for respondents say:

"If there is any accurate method of ascertaining the value of the property devoted to intrastate business, we have never heard of it, and do not know what it is."

The net intrastate basis of revenue could not have been the basis of classification, and, if it was, the proof shows that the complainants

had none. The witnesses for complainants, who are familiar with the roads in Alabama, testify that there was and is no feature in the physical structure or otherwise of complainants' roads showing a difference on which to found a classification to the disadvantage of complainants as compared to the other roads, and they illustrate what they say by a statement of particulars. This is direct evidence and is uncontradicted, and therefore must have weight. Orleans v. Platt, 99 U. S. 676, 25 L. Ed. 404. Differences authorizing classification must not be conclusively occult and undiscoverable. It seems clear that the statutes making a classification of railroads in the state for rates on freights, and agreements for the application and administration of the rate statutes between the Governor and the Railroad Commission of Alabama, as shown in the complainants' bills, deprive the complainants of the equal protection of the laws, and are unconstitutional and void. Gulf, C. & S. F. R. R. v. Ellis, 165 U. S. 154, 17 Sup. Ct. 255, 41 L. Ed. 666; Michigan Tel. Tax Cases (C. C.) 185 Fed. 634; Atchison, Topeka & S. Ry. v. Matthews, 174 U. S. 104, 19 Sup. Ct. 609, 43 L. Ed. 909; Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220; Sellers v. Hayes, 163 Ind. 422, 72 N. E. 119; Ayars' Appeal, 122 Pa. 277, 16 Atl. 356, 2 L. R. A. 577; State v. Hammer, 42 N. J. Law, 440; Cotting v. Kansas, 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92.

It does not require as strong a measure of proof to set aside legislative action where it is, as here, strictly speaking, administrative in its nature, and hinges upon ex parte inventories and calculations of the value of property upon which the lawmaking body without any hearing of the owner determines the reasonableness of a rate against him, as when the lawmaking body decides questions of policy in the other fields committed to the legislative power. Constitutional rights are not to be enforced or denied upon technical grounds of pleading or views of the burden of proof. The courts in the adjustment of rights are often compelled to ascertain the existence of many things which are not capable of proof by mathematical demonstration, and, in ascertaining the adjustment of rights and the remedying of wrongs, all that is possible or requisite is to get the best possible proof of which the nature of the inquiry is susceptible, and that, having been done, to determine the right accordingly, though it cannot be proved to a mathematical certainty, if it produces the requisite measure of conviction.

### Rates Confiscatory.

The question of confiscation—the denial of that just measure of compensation the Constitution secures—depends on the value of the property devoted to intrastate business and the return the proposed rates will yield on such value.

As to this point, we may dismiss from consideration the case of the Nashville, Chattanooga & St. Louis Railway Company with a few words. The complainant has made its proof and submitted its case on the concession that interstate and intrastate business cost the same, while every one who has studied the matter knows that it costs at least 25 cents more to earn a dollar in intrastate than in interstate

business. The concession, therefore, is very liberal to the respondents. On this basis, however, the proof clearly shows that the intrastate commerce of the complainant was conducted at a loss before the passage of the laws in question. It is further shown that the statutes materially reduced this road's earnings. As the rates previous to the statute were reasonable and such as were authorized by law, the statutory reductions complained of are clearly confiscatory. The reason why the intrastate business of this complainant is so unremunerative is because its roads in Alabama are short branch lines, in all consisting of only 128.96 miles, in a sparsely settled country with little commerce, as the master pointed out in his report. A road may afford in some cases to do a particular service at a loss. Thus, if other business, such as interstate commerce, compels the road to be kept up and operated, there are large expenses which must be incurred irrespective of haulage charges, and thus in other respects independent of the new business, and, if such a road can obtain intrastate business which will yield any sum over the added expense of doing that business, it will pay it to take such business, because the amounts thus collected above the added expense of doing the intrastate business will help to discharge the overhead or general expenses which would have to be incurred if such new business had not been undertaken. In this way the intrastate business of the Nashville, Chattanooga & St. Louis Railway, while not covering all the cost which should be charged to it, pays the added cost of doing such business and something over to reduce overhead expenses which would have been incurred if there had been no intrastate business. As the intrastate commerce on this road does not pay the expense of doing the business, the question of the valuation of the property does not arise; there being no proof that previous rates were in themselves unreasonable. As to this road the statutes are clearly confiscatory.

### South & North Alabama Railroad and Louisville & Nashville Railroad.

The South & North Alabama Railroad runs across the mountain ridges and streams of the state, and extends from Montgomery to Decatur, a distance of 192.90 miles. The building of it involved deep cuts, high fills, extensive tunneling, and the construction of costly bridges over large streams, one over the Alabama river at Montgomery, others over the forks of the Warrior river, besides across many creeks. For some distance above Birmingham to Decatur, and some 20 miles below Birmingham, the line is one of the most difficult of construction and maintenance, if not the most difficult of any road in the state. A considerable part of the road is double-tracked.

The Louisville & Nashville Railroad, which operates the South & North Alabama Railroad as one of its divisions, has, independent of the South & North, a mileage of 1,064.24 in the state and altogether in this and other states 4,306.62 miles of road constituting one great system. The road of the Louisville & Nashville in Alabama, however, consists in large part of branch lines doing mostly a local business, which, in so far as it is intrastate, is unremunerative. A large part of its tonnage is of raw materials for iron furnaces, and is carried at

rates lower than any in the United States. These low rates were established and existing long before the passage of the rate statutes now in question, and had their origin in the policy and necessity of supplying the iron industry with raw materials at rates that would enable it to compete in the markets of the world with that of other sections having such transportation or other advantages over Alabama as would drive it out of the markets or suppress the manufacture of iron in Alabama. This policy met with great success in its object, but gave little profit to the road except in the building up of the country and the consequent general increase of business to it and other roads. The Louisville & Nashville Railroad in Alabama to-day, including its many branch roads, is not a first-class road as a whole in any respect, though it is first class in its main line extending through the state from the northern border to Montgomery, Mobile, Pensacola, and New Orleans.

[4] In reference to the question of value with the view of rate regulation, the most reliable test ordinarily is the cost of the reproduction of the road as it exists. I say "ordinarily" because there may be instances, which is not the case here, where by reason of paralleling the road by a new road, and diverting its business or from other causes, its value may be far less than what it will cost to reproduce it as it is at the time of the inquiry. The original cost of a road may in some cases reflect light on, or even determine, the present value, as when it is of very recent construction. But ordinarily it is of little assistance in that regard, since many items of value may be donations by the government or by individuals, as is the case of the south and north, or the road may have been built long before the period of inquiry at greatly less or greatly higher prices than those prevailing at the time of the inquiry. Or its original cost might be involved in obscurity, and may include the cost of abandoned or destroyed portions of the property, which should not figure in the inventory for the present time, or the road may have been bought at a forced sale in times of panic at a nominal price or in inflated times at a corresponding price; or the road, costing little originally, may have developed from many contributing causes into being property of great value. And in every case, after finding the original cost, when possible to be done, the question would still have to be solved as to whether such original cost is the same as the present value, which would involve the determination of the present value for such comparison independent of original cost, and in no other or better way than on reproduction values.

The market value of bonds and stocks, while shedding in some cases light on the question of present value, cannot except in a very slight measure indicate what that value is as a matter of fact. The market value of stocks and bonds merely shows the public estimate of the value of the whole property contributing to the income, which may, as in the case of the Louisville & Nashville Railroad, embrace millions of dollars of property not used have as a common carrier. And this public opinion is also open to the influences of stock jobbing manipulation and artificial bookkeeping, without the advantages of sworn inven-

tories and the precise testimony of competent and disinterested witnesses on exact inventories of existing property. A road may have a small amount of stock compared to its property, as in the case of the Louisville & Nashville Railroad, and it may have no bonds or a large amount of bonds against its property and the two combined may not, with premiums or discounts taken into consideration, indicate with any accuracy the present values of the property invested in the business and used as a common carrier. Therefore, while looking at all collateral matters reflecting light on the subject, the court regards the reproduction cost as the final test of present value.

Under inquiry 18 in the South & North Case the special master reports at page 72 et seq. the cost of reproducing the railroad and other properties, after deducting $328,419 from complainants' figures, for the years named, as follows:

Year ending June 30, 1906.................................... $20,041,714 84
Year ending June 30, 1907.................................... 21,077,210 17
Year ending June 30, 1908.................................... 22,077,003 12
Year ending June 30, 1909.................................... 22,151,800 36
Year ending June 30, 1910.................................... 23,372,752 27

Under the same special inquiry 18 at page 112 et seq., in the Louisville & Nashville Case, the master reports the cost of reproducing the railroad and other properties, including equipment used as a common carrier, after making deductions from complainants' estimates of $674,673.92, for the years named, as follows:

Year ending June 30, 1906.................................... $41,258,565 60
Year ending June 30, 1907.................................... 43,039,940 60
Year ending June 30, 1908.................................... 40,800,349 22
Year ending June 30, 1909.................................... 41,194,712 68
Year ending June 30, 1910.................................... 41,443,462 39

The respondents urged before the master all the objections now set up in the exceptions filed to his reports as to these values, and they were noticed seriatim, discussed, and disposed of by the master as shown in his reports. After considering the exceptions, I approve and confirm the findings of the master on the questions of values and cost of reproduction, and overrule the exceptions in that regard of respondents and complainants, and approve and confirm the master's reports thereon.

One of the objections of the respondents is that the estimates were based on the prices of 1907 when they were made, and that they were then unusually high. This is disposed of by the point that present values are required to be taken and used in determining present and prospective rates. Cotting v. Kansas, 183 U. S. 91, 22 Sup. Ct. 30, 46 L. Ed. 92; Willcox v. Consolidated Gas Co., 212 U. S. 19–52, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034; Stanislaus County v. J. C. & I. Co., 192 U. S. 215, 24 Sup. Ct. 241, 48 L. Ed. 406. And by the fact that the proof satisfactorily shows that the reconstruction could not have been effected from 1907 to 1910 at less than the estimates used. Record, S. & N. A. 116, 118, 368, 417, 430, 432, 497, 501; Record, L. & N., 365–367.

It is insisted that in reproduction estimates the enhanced value of property between the time of the original location of a railroad through

a wilderness or marsh, it may be, is not to be taken into account 40 or 50 years afterwards, when civilization, perhaps largely the result of the expenditures and operations of the road, has increased original values a hundredfold. Suppose a road is located when original cost is fabulously inflated, and the course of events brings things down to their intrinsic worth, upon whom does the loss fall? It is usually understood that the state does not make up such losses to its citizens. And, vice versa, when minerals are discovered, or oil wells developed on lands, does not the owner of the land own its product? And how are tax values estimated? Do the officers take the value when land is first entered and cleared or when it has been improved and become a town site? The law is perfectly settled, with the obvious view of the matter, that increments and losses alike attach to ownership as to duties and rights pertaining to property. Willcox v. Con. Gas Co.. 212 U. S. 52, 29 Sup. Ct. 192, 53 L. Ed. 382; Stanislaus v. Irrigation Co., 192 U. S. 215, 24 Sup. Ct. 241, 48 L. Ed. 406; San Diego Land Co. v. National City, 174 U. S. 757, 19 Sup. Ct. 804, 43 L. Ed. 1154. And this just rule has its balances and adjustments making it not oppressive to the public in any case. It is to be noticed, too, that the rates in fact usually diminish with the increase in property values, because the increase of business dominates values and justifies lower rates; but, be that as it may, the rule of giving to the owner the increments of value and subjecting him to the losses in values has the unequivocal sanction of the law.

[5] The respondents except to the value of the franchise in the Louisville & Nashville Case on the ground that there is no evidence of the value in the record. Exception 10, L. & N. Case. And in the South & North Case, on the ground that "the valuations are erroneous and excessive." Exception 4, South & North Case.

As to the amount of valuation, the undisputed proof is that it is the tax valuation at 60 per cent. of real value brought up to par or 100 per cent. This could not be excessive if the tax value was 60 per cent. of the real value, and the uncontradicted proof is to that effect, and the proof is that it is not excessive. As to the factum of evidence being in the record of the value, it is shown that the law charged the State Tax Commission with the duty of assessing the franchise for taxation, and they did so and fixed the value at 60 per cent. of the real value, and it is shown what these assessments were. Record, L. & N. Case, 1927, 1928–1960; Record, S. & N. Case, 1389, 1400, 1598, 1599, 2622–2627, 2628, 2629, 2644–2648.

The assessments relied on were state valuations by officers specially delegated to make them, and not merely to receive the returns of the taxpayer. They are therefore competent evidence of probative worth. Wigmore on Evid. § 1640; Elliott on Evidence, § 1312; Ronkendorff v. Taylor, 4 Pet. 349, 7 L. Ed. 882. As to the propriety of valuing the franchise on a rate question, the authorities clearly settle the point in the affirmative. I refer to the master's report in the South & North Case, pp. 41–46, where he considers the question in an able manner, and I concur thoroughly in his conclusion. I merely cite here the authorities. Willcox v. Con. Gas Co., 212 U. S.

19–54, 29 Sup. Ct. 192, 53 L. Ed. 382, 15 Ann. Cas. 1034; Mononga-hela v. United States, 148 U. S. 321, 13 Sup. Ct. 622, 37 L. Ed. 463; People v. O'Brien, 111 N. Y. 1, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684; Topsham v. Maine W. Co., 99 Me. 371, 59 Atl. 537; State Railroad Tax Cases, 92 U. S. 606–607, 23 L. Ed. 663; Water-works Co. v. Kansas City, 62 Fed. 863, 10 C. C. A. 653, 27 L. R. A. 827; Metropolitan T. Co. v. H. & T. Co., etc. (C. C.) 90 Fed. 683–689; Adams Express Company v. Kentucky, 166 U. S. 171, 17 Sup. Ct. 527, 41 L. Ed. 960; Fargo v. Hart, 193 U. S. 490, 24 Sup. Ct. 498, 48 L. Ed. 761; Adams Express Company v. Ohio, 166 U. S. 185–221, 17 Sup. Ct. 604, 41 L. Ed. 965; Beale and Wyman on R. R. Rate Regulation, §§ 368–370.

[6] Having ascertained the value of the entire property devoted to the public use as a common carrier, the next question is a division of this property between the intrastate and the interstate commerce, for rates can have relation only to the share or proportion of the servient property devoted, respectively, to intrastate and interstate business. Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. The counsel for respondents contend that, though a public service railroad corporation is entitled to a fair return upon the value of its property devoted to a public use, it is only true when applied to all the earn-ings of a corporation in its combined interstate and intrastate com-merce, and that the rule has no application to a separation of prop-erty values between intrastate commerce and interstate commerce, be-cause such a separation is impossible. They thus state their position:

"But when, in the case of the business of a railroad company, we seek to determine the value of that portion of the entire property which is devoted to intrastate traffic, separate from the value of that portion devoted to inter-state traffic, when precisely the same property is devoted to both classes of traffic jointly, and to determine the expense of doing the intrastate business, separate from the expense of doing the interstate business, when the expenses incurred and charged are incurred in doing both classes of business jointly, we are dealing in pure conjecture—conjectures such as would not be received and made the basis of an injunction restraining the operation of a statute in any kind of an issue other than a railroad rate issue. Not only is any known method of ascertaining these facts uncertain and conjectural, but they are facts which from their very nature are incapable of ascertainment even ap-proximately. No two railroad accountants agree as to the proper method of ascertaining these facts, and all agree that they cannot be ascertained ac-curately. We insist that they cannot be ascertained with even an approxi-mate accuracy. It has been said that, notwithstanding the difficulty of as-certaining the value of property devoted to intrastate business and the amount of the expense incurred in doing the intrastate business, we must do the best we can to that end, and then, however uncertain and speculative the result, a state statute establishing intrastate rates must stand or fall according to that result. A proposition or principle of law, the justice of the application of which is made to depend upon the proof of facts which are not susceptible of proof, or at least can only be guessed at or ascertained by ar-bitrary and conjectural methods, must be fallacious. * * * How is it pos-sible for a court in the ordinary rate case to be convinced clearly and beyond all doubt that a particular schedule of rates necessarily denies just compen-sation for the use of the railroad company's property, when the essential facts upon which the conviction must be based are from their very nature speculative and conjectural?"

This exposition by counsel, if accepted, would result in one of two propositions: One, that the state could fix rates for inter and intra

state commerce as a unit; the other, that it could fix an arbitrary rate for the state business not subject to judicial review. Neither position can be true. If the valuation of the common property is indivisible between inter and intra state commerce, it is plain that, as Congress must regulate the interstate commerce, it would have to regulate at the same time the intermingled intrastate commerce, and thus that the state could have nothing to do with it. It appears to be preposterous to suppose that the state can fix the reasonable returns on the property devoted to its use by the carrier without reference to the value of the property thus devoted to the purposes of a common carrier.

[7] It is admitted that the allotment to interstate and intrastate commerce of the proper share of the property used in common by the two is an exceedingly difficult problem, arising from the conceded fact that, though the units of service are the same in each, the relative aggregate cost of the two services is very different. If the ton and passenger miles were of uniform cost in the two, of course, the share of each in the use of the property would be the proportion of the whole value which the gross earnings of each bear to each other, or the earnings of each to the whole earnings. But, where two persons or patrons are served by a common property, one may do less business but require in doing it the use of the property in a greater proportion than the other, and therefore the relation of the respective services to each other can only be determined by first settling the relative cost of doing each business. Chicago, etc., v. Tompkins, 176 U. S. 179, 20 Sup. Ct. 336, 44 L. Ed. 417; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819.

The difficulty of the problem arises from the fact that the cost of transportation involves an assessment on the subjects of commerce of charges to cover common, general, overhead, or nonhaulage expenses and also the haulage cost, and that there is no way of allocating such charges to the transportation items when the property is used in common as stated by counsel for the respondents. It cannot be said what share of these common expenses shall be apportioned to an intrastate ton or passenger being transported. It may be in the same train and car with interstate tons and passengers. The solution of the question has heretofore been made to rest entirely on the experience and testimony of experts as to the relative difference in cost of the two services, and in every case in which the question has arisen the witnesses have, while agreeing on the fact that local or intrastate business is more costly than through or interstate business, varied very widely as to the amount of such difference. The variation is from 10 per cent. to 500 per cent. against the intrastate business. Smyth v. Ames, supra. It was pointed out in Chicago, etc., v. Tompkins, 176 U. S. 179, 20 Sup. Ct. 336, 44 L. Ed. 417, that any solution of the question on a gross revenue basis without regard to the difference in the relative cost of the two services was an absurdity. And so the difficulty was attempted to be overcome by putting a load, as it is called, on the intrastate revenue to equalize it for the purposes of comparison with the interstate. And the amount of this load was determined by

the opinion of the witnesses, who guessed at it scientifically or otherwise, leaving a very unsatisfactory task to the court in fixing on the proper amount.

Appreciating the unreliability of any solution of the question of difference on any revenue basis, the Louisville & Nashville Railroad Company undertook to ascertain the difference on the basis of the comparison of the actual cost of conducting each business, and at great expense took an accurate account of the cost of every particular item of transportation for a period of a week or more over their lines in Alabama, allocating such cost when possible and apportioning it when impossible of allocation between the interstate and intrastate business. It was shown that the period selected was a fair and average period of business. By this method, which is called the "unit of service basis," the actual relative cost of doing the interstate and intrastate business was arrived at. The plan and method of the operation is explained in the report of the master in the Louisville & Nashville Case at pages 165 to 195. Of course, as pointed out in the report, the proportion of the actual cost of many of the accounts of expense allotted to the two services was necessarily based on the judgment or opinion of the officers in actual superintendence, as no allocation in such cases was possible. And for this reason there would necessarily be room for saying, as to the conclusion or result, that, however honest, it contained to that extent the inherent infirmity of opinion proof. But it happens that the results are confirmed in several ways which remove all uncertainty as to their accuracy and justness in these cases. The Louisville & Nashville has 13 divisions of its line in Alabama in which separate accounts are kept of the interstate and intrastate gross earnings, and of the actual expenses of such divisions without separation between interstate and intrastate traffic. These accounts are shown in Exhibit W. A. C. 67. In some of these divisions the interstate traffic predominated; in others the intrastate. An analysis and comparison of the earnings and expenses in the intrastate divisions, and of the earnings and expenses in the interstate divisions, reveals the fact that just in proportion as the intrastate traffic exceeds the interstate business in the divisions the cost of earning a dollar on all business increases, and that the difference between the cost of earning a dollar in the interstate business is greater than that shown in the results of the application of the unit of service basis. Master's Report, L. & N. Case, pp. 161–165. By the unit of service basis the result is that it costs at least 25 per cent. of the revenue more to earn a dollar of intrastate revenue than it costs to earn a dollar from all business. Record, L. & N. Case, 1600.

The complainants in the Louisville & Nashville Case and the South & North Case show, also, by algebraical calculations founded on equations taken from accurately kept accounts of the earnings and expenses of their roads, that the excess of earning a dollar in intrastate business over all business is 32 per cent. of the revenue in the Louisville & Nashville Case, and in the South & North Case 26 per cent. of the revenue. This is explained and shown in the Louisville & Nashville Case, Record, pp. 1600–1608, Master's Report, 165, and in the

South & North Case, Record, 6178, Master's Report, 169. These confirmations make the result on the application of the unit of service basis perfectly reliable as showing that the difference between the cost of doing intrastate business and all business is certainly not less than 25 per cent. of the revenue of intrastate commerce.

[8] Equalizing the intrastate business with the interstate business on this basis, and taking the proportion of the whole values of the property indicated by the proportion of the revenue of each thus equated, to the whole revenue, the proportionate share of the interstate and intrastate of the whole property devoted to the service of the public as a common carrier is shown in the report of the master under inquiry 18 in each case, in the Louisville & Nashville Case at pages 115–116, and in the South & North Case at page 77.

The yearly ratio of the income of the complainants to these values for the years 1906, 1907, 1908, 1909, and 1910 is shown in the master's report under inquiry 28. From the report it appears that the Louisville & Nashville Railroad had the net income or loss on its intrastate business as follows for the years named:

For the year ending June 30, 1906, net profit...................... .38%
For the year ending June 30, 1907, net loss....................... .95%
For the year ending June 30, 1908, net loss....................... 3.97%
For the year ending June 30, 1909, net loss....................... 1.91%
For the year ending June 30, 1910, net loss....................... .82%

See Master's Report, 211, 212.

And that the South & North Alabama Railroad had the following net income or loss on its intrastate business for the years named:

For the year ending June 30, 1906, net loss....................... .53%
For the year ending June 30, 1907, net loss....................... .46%
For the year ending June 30, 1908, net loss....................... 1.59%
For the year ending June 30, 1909, net loss....................... .40%
For the year ending June 30, 1910, net loss....................... .025%

—Master's Report, p. 150.

These percentages are those on the income as affected by the statutory rates. Without the statutory rates the percentage would have been larger of profit or less of loss, but not to an extent to alter the result as to the question involved since, without the statute, the intrastate earnings afforded no fair return. It appears that in the Louisville & Nashville Case the intrastate business resulted in the year ending June 30, 1906, in a net profit of .38 per cent. on the value of the property and in the following years, including 1910, in a net loss of from .95 per cent. in 1907 to 3.97 per cent. in 1908. And in the South & North Case there was a net loss each year varying from .025 per cent. in 1910 to 1.59 per cent. in 1908.

The respondents insisted in argument that the intrastate rates on great tonnages of raw material not affected by the statutes in question were abnormally low, and might be increased to materially augment the income, but they overlooked the fact that a statute belonging to the same series approved February 9, 1907, prohibited any increase of the maximum rates prevailing January 1, 1907 (Acts Ala. 1907, p. 80), and, further, that these rates had prevailed for many years

prior thereto, and that they were necessary to sustain the iron industry in Alabama and transportation resulting therefrom to the railroads.

The exceptions filed by the respective parties to the report of the master on the questions of earnings and the expenses of the business and the division of the same between interstate and intrastate traffic are disallowed and overruled. The same questions were raised before the master, and were severally considered and correctly ruled on as shown in his report.

Contrasting the ratio of total income from entire business with the ratio of intrastate income for the same periods, we have for the Louisville & Nashville Railroad Company:

For the year ending June 30, 1906... { entire business.............. 4.94%
{ intrastate business.......... .38%

For the year ending June 30, 1907... { entire business.............. 3.92%
{ intrastate business (loss)...... .95%

For the year ending June 30, 1908... { entire business.............. 1.28%
{ intrastate business (loss)...... 3.97%

For the year ending June 30, 1909... { entire business.............. 3.45%
{ intrastate business (loss)...... 1.91%

For the year ending June 30, 1910... { entire business.............. 5.20%
{ intrastate business (loss)...... .82%

And for the South & North Alabama Railroad:

For the year ending June 30, 1906... { entire business.............. 5.74%
{ intrastate business (loss)...... .53%

For the year ending June 30, 1907... { entire business.............. 5.79%
{ intrastate business (loss)...... .46%

For the year ending June 30, 1908... { entire business.............. 2.67%
{ intrastate business (loss)...... 1.95%

For the year ending June 30, 1909... { entire business.............. 5.45%
{ intrastate business (loss)...... .04%

For the year ending June 30, 1910... { entire business.............. 5.86%
{ intrastate business (loss)..... .025%

The above tables are from the report of the master under inquiry 28, and are on basis of income after deducting statutory losses; that is, what the income was under the rate statutes after it went into effect. The year ending June 30, 1906, was before the statute, and most of the year 1907. It is evident that the most radical errors in valuations, if made, would not, on correction, show a fair return to complainants on the property invested. It is shown that the statutory rates effect a loss of from 10 per cent. to 50 per cent. reduction on the rates prevailing before the statutes were passed on the same commodities, and that the total losses to the Louisville & Nashville per annum on account of the statutory rates is $263,252.52 on the basis of losses for the six months from June 30 to November 30, 1909. (Master's Report, L. & N. Case, p. 205, and record there cited); that the South & North losses are, on the same basis, per annum $210,-286.46 (Master's Report, S. & N. A. R. R., 124, and record cited).

These losses do not comprehend in either case the much greater losses which will occur to the net revenue on all business if, and when, interstate rates are adjusted to the forced statutory rates, which is an inevitable result, both from commercial necessity and to avoid unjust discrimination against interstate commerce, as recently decided by the Interstate Commerce Commission. The schedule of rates prevailing prior to March 2, 1907, when the first rate statute was passed, had been in force for a long time, in fact there had been a general tendency to reduce rates since the opening of the roads to that date. The rates were reasonable. Under them the state had flourished and been greatly developed especially along complainants' lines, and there was no congestion of commerce on account of excessive rates. The intrastate rates in Alabama on the complainant's lines were, on the average, materially lower prior to March 2, 1907, when the first rate statute was enacted than in any other Southern state and are now materially lower, on an average, than any in the United States. Record cited in master's report in South & North Case, p. 170. It is plain that the rate statutes were not the result of any unreasonable exactions by complainants' rates prior to their passage, and it is demonstrable that the reduction in rates produced by the statutes, while causing immense losses to the complainants directly as well as in its interstate income, does not stimulate trade, and does not cheapen in any degree the selling price of commodities to the people. Commerce or traffic is nothing more than the interchangeable flow of surplus commodities from one community or country to another. There must be population to produce and consume at each end of and along the transit, and this is limited by nature, and is only the subject of slow development. There is little margin in life of aggregate surplus products over aggregate consumption demands so that there can be no great variation in the volume of trade year by year. A variation of 10 per cent. or 20 per cent. either by addition or by subtraction in freight rates on articles consumed by the people and the subject of transportation is so infinitesimal compared to the selling price to the consumer that no account whatever of it is taken in his favor. Yet such reductions in the aggregate will bankrupt the carrier. It is commonly known that it is the last 10 per cent. of the freight and passenger charges that furnishes all the profit to the business. This may be illustrated both ways to show the benificence and bad effects of the statutory reductions.

The proof shows that a garment selling at retail in Alabama at 50 cents and weighing half a pound has a freight rate of 26 cents per hundred pounds from Mobile. The freight on the garment is $^{13}/_{100}$ of a cent or $^{1}/_{380}$ of the price. Cotton overalls selling at $1, weight one pound, have a freight rate of 26 cents per hundred pounds, and the total freight is $^{26}/_{100}$ of a cent on the garment. This view is applied in the proof to long schedules of the commodities affected by the rate statutes (L. & N. Record, 3635), and demonstrates that 10 per cent. or 20 per cent. reduction in the freight rates would and does not make the goods any cheaper to the ultimate consumer or purchaser. The people buy from necessity, and their demands are not enlarged nor

their ability to buy increased by freight being reduced on a tin cup $\frac{1}{1000}$ or $\frac{1}{50}$ of 1 cent, or 25 cents on a $30 suit of clothes, or 2½ cents on a $10 plow. A man does not eat two dinners because they can be had at 49 cents instead of 50 cents, and a farmer does not buy two mules when he does not need but one because the freight is reduced $1 on a $200 mule, nor in any such case would he get the benefit of the reduction; nor in such cases is commerce stimulated when there was a free flowing current before these infinitesimal reductions.

The gross earnings of the Louisville & Nashville Railroad in Alabama for the year 1910 amounted to $8,434,099.08, and on intrastate business $3,615,102.61. Take 10 per cent. or 20 per cent. or 40 per cent. from these sums, and there would be left in the case of 20 per cent., only $470,221.77 of net income for entire business, and only a ratio of 1.13 per cent. on value of $41,443,462.39, instead of a ratio of 5.20 per cent., without this 20 per cent. reduction in income from rates. A similar catastrophe would follow in the case of the South & North Road, and, it is believed, of any road in the United States. There is no margin of 20 per cent. or even 10 per cent. to be spared on the earnings of any road. And, of course, as there was during that year (1910) a net loss of .82 per cent. without such supposed reduction of 20 per cent. of rate income on intrastate business, the reduction of 20 per cent. or even 10 per cent. would add to such loss.

The effect of the statutory reduction of rates then in these cases is to inflict a direct additional loss on the intrastate business, in the case of the Louisville & Nashville of $263,252.52, and in the case of the South & North of $210,286.46, per annum, when there was no net income above operating expenses on such business under the prevailing rates when the statutes in question were enacted making the reductions. Of course, such being even proximately the result, it is evident that the Legislature misapprehended the situation when the statutes were enacted. Inter and intra state business consist in the transportation of persons in any number, and of freight in any quantity, for any distance, on the lines of the carrier. At first view, it may appear surprising, at least to ordinary observation, that it costs relatively much more to do the intrastate than it costs to do the interstate business in the aggregate. The explanation is that the intrastate business generally involves short hauls with many stoppages and in less than car load lots; while the reverse is the case with the interstate business, which is generally through traffic with full loads, few stops, and for much longer hauls. It is evident that there is more profit in full loads, long hauls, and few stoppages than in the reverse. Another difference in the relative costs of the two traffics arises from the fact that the cost is composed of two classes of items—those affecting distance or haulage, and those not affecting distance or nonhaulage or terminal charges. It is estimated that 90 per cent. of a 30-mile haul is made up of nonhaulage cost, but the nonhaulage cost is uniform; that is, it does not increase with the length of the haul. It attaches alike to intrastate and interstate shipments. Let me illustrate this: A terminal charge at the point of starting say is $1 per ton, or any sum. Now, if we take an intra and an inter state ton

starting at the same time on a journey, the intrastate ton will arrive at its destination at, say 10 miles, and there will stop and incur another terminal charge, say of $1, or any other sum. The interstate ton goes its journey, say, of 200 ·miles, and stops in another state. Now the initial terminal charge of $1 in the case of the interstate ton is distributed on 200 miles of transportation. The intrastate initial terminal charge and the final terminal charge are distributed on a transportation of only 10 miles. It is thus seen that the interstate ton bears only a small fraction of the cost per mile of terminal charges that the intrastate ton is subjected to. Thus it is universally recognized that the cost of transportation relatively diminishes with the increase of distance, for it is well known that local traffic takes more time, more fuel, more wages, more water, causes more wear and tear, and has less loads than the through traffic, and greater terminal charges per mile. It is therefore recognized by all who have investigated the subject that, though the same rates are charged on the same character of business in each service, a road may make a profit on its interstate business, and at the same time sustain a loss on its intrastate commerce.

[9] As to the question of what per cent. of the value of the property used as a common carrier the complainants are entitled to earn, an answer is hardly pertinent in this case, as to the intrastate business, since it appears that there is, in fact, practically no return. But the question is important in the view taken of it by counsel for respondents. They insist, as pointed out above, that the intrastate business is coupled with the interstate business, and, if the whole business yields a proper return, the carrier should be satisfied, though the intrastate business is done at a loss, and that buyers of bonds never consider the income on a part of the property. This, however, is not a logical view. It is settled that, if intrastate commerce is distinct as to rates from interstate, it must be distinct throughout, and that state statutes regulating rates must have reference only to the intrastate proportion of the value of the property. Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819. In reference to what is a proper return on railroad property, I cannot do better than quote from the report of the Railroad Securities Commission recently transmitted to Congress by the President. In dealing with the direct question it says, in section 30, p. 36:

"We hear much about a reasonable return on capital. A reasonable return is one which under honest accounting and responsible management will attract the amount of investors' money needed for the development of our railroad facilities. More than this is an unnecessary burden. Less than this means a check to railroad construction and to the development of traffic. Where the investment is secure, a reasonable return is a rate which approximates the rate of interest which prevails in other lines of industry. Where the future is uncertain the investor demands, and is justified in demanding, a chance of added profit to compensate for his risk. We cannot secure the immense amount of capital needed unless we make profits and risks commensurate. If rates are going to be reduced whenever dividends exceed current rates of interest, investors will seek other fields where the hazard is less or the opportunity greater. In no event can we expect railroads to be developed merely to pay their owners such a return as they could have ob-

tained by the purchase of investment securities which do not involve the hazards of construction or the risks of operation."

The whole question was elaborately discussed in Central of Georgia Railroad v. Railroad Commission of Alabama et al. (C. C.) 161 Fed. 925, wherein it was held that railroad companies in Alabama were entitled to be permitted to earn a net profit of 8 per cent. per annum on the value of the property employed by them in intrastate business so long as the business was done without unjust discrimination and at reasonable rates.

## The Maximum Rate Act.

[10] On the 11th of February, 1907 (Acts Ala. 1907, p. 80), the Legislature passed a law enacting that the freight rates of railroads obtaining on January 1, 1907, for intrastate transportation, should be fixed as the maximum of rates to be charged. This act is one of the series enacted at that time to regulate rates in Alabama. The proof shows that the rates at the date mentioned were unremunerative, and did not yield a fair return to the carrier. They were fixed as to the greater part of complainants' intrastate tonnage to meet a particular occasion, viz., that of enabling the iron industries of Alabama to compete in the markets with their respective products, and, the occasion having passed, the carrier might have desired to adjust rates to changed circumstances, and certainly, as such rates were lower than were necessary to yield a fair return for transportation, there was an undoubted right to change them. Although the rates may have been the result of the carrier's voluntary act, this would not prevent them from being confiscatory when they became fixed by statutory authority. Lake Shore, C. & R. R. v. Smith, 173 U. S. 684, 697, 19 Sup. Ct. 565, 43 L. Ed. 858. The argument of respondents in these cases is that these rates should be increased so as to keep the statutory rates of the Eight Group Acts from being confiscatory. This is a concession that they themselves were confiscatory under the schedule of January 1, 1907, which the proof clearly shows them to be. There certainly ought to exist the right in the carrier to change rates which to meet an exigency had been made too low, and to meet changed circumstances with rates to correspond. This statute in denying the carriers this privilege, and in forcing them to continue in operation confiscatory rates, violates the Constitution, and is void.

Two years before the enactment of the statutes complained of, the Railroad Commission of Alabama made an exhaustive investigation of the reasonableness of the intrastate rates then charged in Alabama, the net revenues the carriers derived therefrom, and decided among other things that "the net earnings shown by the several railroads operating in Alabama are not in excess of a fair and just return upon the legitimate value of the property employed," and that reductions would be confiscatory. A table annexed to the opinion then rendered showed that the Louisville & Nashville Railroad Company earned 2½ per cent. from its domestic business on the proportion of its property devoted to intrastate business, and that there was a deficit in the case of the Nashville, Chattanooga & St. Louis Railroad Company. Nothing is shown in the proof in these cases, or by any matter of which

the court could take judicial notice, to create any just foundation for a belief that in two years thereafter conditions had so changed and improved that the carrier could obtain three times more net earnings than before, and on reduced rates.

## Interference With and Control of Interstate Commerce.

It has been strenuously insisted on the one side and denied on the other that the rate statutes in these cases as to local rates necessarily affecting interstate rates on an interstate road amount to a direct regulation of, and control of, interstate commerce, and that the statutes are void on that ground also. The argument in support of that contention is stated in a masterly manner by Judge Sanborn in Shepherd v. Northern Pac. Ry. Co. et al. (C. C.) 184 Fed. 765. The master sustained those views, and held that the state had no power to make rates on railroads engaged in interstate commerce. As I have held the rate statutes attacked in these cases void on two distinct grounds, I deem it unnecessary to go into the question of their being void on a third and distinct ground that they directly interfere with and control the interstate commerce of the complainants. This direct point is involved in the Minnesota case now before the Supreme Court and will doubtless be decided within a few weeks. While Congress under its power to regulate interstate commerce and to preserve its uniformity may have the power to annul state rates which interfere with that result, I do not believe that under the present statutes Congress has done so. I will therefore sustain the exceptions of the respondents in the several cases to the master's findings on this point.

Counsel for complainants may prepare a draft of the decree in accordance with this opinion, and submit it to counsel for respondents.